WILLIAMS *v.* SCHOOL CITY OF WINCHESTER.

[No. 16,030. Filed October 13, 1937.]

**84**

Noel, Hickam, Boyd & Armstrong, John D. Wilson and John W. Macy, for appellant.

White, Wright & Boleman and George C. Forrey, III, for appellee.

WOOD, J.—This is an appeal from an award of the full Industrial Board denying compensation to appellant as the sole surviving dependent of her deceased husband, Arlam R. Williams. The appellant properly alleges as error for reversal, that the award of the full Industrial Board is contrary to law.

A majority of the members of the Industrial Board made a finding and award as follows: "And the full Industrial Board having heard the argument of counsel, having reviewed the evidence and being duly advised therein, now finds that on April 16, 1936, one Arlam R. Williams died; that at the time of his death the said Arlam R. Williams was living with Maude Gordon Williams, his wife, who was wholly dependent upon him for support. That on August 6, 1936, plaintiff herein filed her application for the adjustment of a claim for compensation.

"And the full Industrial Board now finds by a majority of its members that the death of said Arlam R. Williams was not due to any accidental injury arising out of and in the course of his employment with the defendant.

## ORDER

"It is therefore considered and ordered by the full Industrial Board of Indiana by a majority of its members that plaintiff shall take nothing by her complaint herein, and that she shall pay the costs of this proceeding."

The only evidence before the full Industrial Board was that introduced on behalf of the appellant. It is uncontroverted and may be summarized as follows: For some years previous to April 15, 1936, and upon that date, Arlam R. Williams had been and was superintendent of schools of the School City of Winchester, Indiana, under and pursuant to a written contract entered into between himself and the board of school trustees of said city.

This contract was first entered into in August, 1931, for a period of one year, and was continued from year to year thereafter, the contract under which he was working on April 15, 1936, by its terms, terminated on August 1, 1936. His wages were $3,000 per year. In the hiring of teachers for the schools of Winchester, it was one of the duties of the superintendent to interview applicants for teaching positions, to make an investigation of their qualifications for the position sought and report his findings to the board of school trustees with recommendations, which were usually accepted by the board and upon which it acted. Sometime previous to April 15, 1936, the board of school trustees had received an application from a teacher living in Greentown, Indiana, located a short distance from Kokomo, Indiana, for employment in the schools of Winchester. Prior to April 15, 1936, the members of the board of school trustees of Winchester and the superintendent of schools had received an invitation to attend a meeting of school officials, members of school boards and school superin-

tendents to be held at Kokomo on that date, for a general discussion of school problems. The members of the board of school trustees were not able to attend this meeting. Williams was notified of the meeting by the president of the board. On Monday evening, April 13, 1936, a regular monthly meeting of the board of trustees was held at which all members and Williams were present. The advisability of Williams attending the meeting at Kokomo, and at the same time interviewing the applicant for employment as a teacher and making an investigation of his qualifications as such was presented to the board of trustees for consideration and determination.

Here we quote the record, Dale Brown, president of the board of school trustees testifying as a witness for and on behalf of the appellant:

"Q. Did you receive any invitation to that meeting?
A. I did.
Q. How did you receive that?
A. By post card through the mail.
Q. And did you notify any other members of the board or Mr. Williams of this meeting?
A. I notified Mr. Williams.
Q. And you said there was some discussion at this meeting on Monday night.
A. There was.
Q. What is the fact about your board instructing Mr. Williams to attend this meeting?
A. We thought it would be a good idea for him to attend this meeting because he was investigating teachers at that time and on this particular trip he could find out more about a teacher that he was interested in.
Q. At this same meeting was there any discussion had about a prospective teacher?
A. There was.
Q. Do you know the name of this applicant we are speaking about?
A. I don't remember the full name, but I think the last name is Green.

Q. Can you tell the court where he lives?

A. I believe it was Greentown.

Q. As I understand now, the school meeting was at Kokomo, Indiana?

A. That's right.

Q. Can you tell the court where Greentown is with relation to Kokomo?

A. No, I don't know exactly.

Q. Now just tell the court what was said at this school board meeting about Mr. Green applying for a position with the School City?

A. Well, Mr. Williams seemed very much impressed by the man and was very much interested in hiring him and of course Mr. Williams made our investigations for us and then we could act on his recommendation and we told him we thought it would be a very good idea for him to attend this meeting at Kokomo and also it would give him a better chance to find out more about Mr. Green, as he thought there would be others at the meeting who knew Mr. Green and I told him at the meeting that would be a good chance to kill two birds with one stone.

Q. Did you understand at that time that Greentown was close to Kokomo?

A. I think it was close.

Q. And at this meeting of the school board you told Mr. Williams to attend this meeting at Kokomo, is that true?

A. We thought it would be a good idea for him to attend,—

Q. You have not answered my question. Did you instruct him to attend this meeting?

A. Yes, because we wanted him to find out more about this teacher.

Q. Did you members of the school board have some discussion about going along with Mr. Williams to this meeting?

A. Yes, Mr. Goodrich said that he couldn't go and it was impossible for me to get away and I think Mr. Turner was going but I guess something came up that he wasn't able to go.

Q. What is the fact about your board instructing Mr. Williams to interview all applicants for positions?

A. We instructed him to interview all appli-

cants and not have them come to us as members of the board and then he would recommend to us the ones he thought we should hire.

HEARING MEMBER: I want to ask him a question. When you talked to Mr. Willinams at this school board meeting about going over to Kokomo to attend this meeting and to interview this prospective teacher, at Greentown, did you issue a direct order for him to go over there and attend this meeting and to interview this prospective teacher, at Greentown, did you issue a direct order for him to go over there and attend this meeting or did you just suggest that he should go?

A. He said that he was going and we thought that was a good idea.

HEARING MEMBER: Did you say to him 'all right, go,' or what did you say to him?

A. Yes.

HEARING MEMBER: What was your conversation with him about going over to Kokomo? Let's get it all in the record.

A. He told us about this man on the night of the meeting and told us he thought he could find out more about him by going to Kokomo and we told him we thought that was a good idea and for him to go ahead.

Q. Now that meeting, as I understand it, Mr. Williams said he thought it would be a good thing for him to go to Kokomo to this meeting because he would find some people there from whom he might get a line on this applicant for the job?

A. Yes, he said he was going for that.

Q. He told you he was going?

A. Yes.

Q. Then he wasn't ordered to go by any member of the school board?

A. It was part of his duties.

Q. It was part of his duties?

A. Yes.

Q. He told you he was going?

A. Yes."

After this meeting with the board of school trustees on Monday evening, Williams arranged with the superintendent of schools of Union City, Indiana, to ride to Kokomo with him in his automobile. While en route to

Kokomo, the automobile in which Williams was riding collided with another automobile. In this collision, he sustained injuries which caused his death on April 16, 1936. The Winchester schools were in regular session during all this time. So far as the record shows, Williams was making this trip at his own expense.

In that portion of their brief devoted to argument, counsel for appellee say: "Conceding that appellant's decedent was an employee of the School City of Winchester, the only question remaining to be considered is whether or not the accident which resulted in the death of the deceased arose out of and in the course of his employment, since the dependency and the cause of the death are admitted."

Counsel for appellee call our attention to those well established rules of law which control this court in its consideration of the facts as found by the Industrial Board, and insist with much earnestness that the facts as found by the Industrial Board in the instant case when examined in the light of these rules of law are fully sustained by the evidence.

In answer to this contention, counsel for appellant in their reply brief say: "No question of weighing evidence is involved in this case. The authorities cited by appellee with reference to the effect of a finding of the full board are undoubtedly sound law, but they do not apply where, as here, but one inference can reasonably be drawn from the evidence. The question then becomes one of law."

The verbatim copy of the evidence above set out is all the evidence in the record pertaining to the attendance at the Kokomo meeting, and the investigation of the prospective teacher by Williams.

From this evidence it appears that it was a part of the superintendent's duties to attend meetings devoted

to a discussion of school problems and to investigate the qualifications of applicants for teaching positions in the Winchester schools, and that one of the purposes of making the trip to Kokomo was to enable Williams to make such investigation of the applicant living in Greentown, and it was while he was engaged in the performance of this duty that he suffered the injuries resulting in his death. The evidence also shows that he entered upon the performance of this duty with the knowledge of and under instructions from the board of school trustees, which possessed the authority to prescribe and direct the discharge of the duties of the superintendent of schools. Section 28-1401 Burns 1933, section 6687 Baldwin's Ind. St. 1934.

Williams' duties were something more than a teacher, he was superintendent of the schools of Winchester; he had general supervision and management of the schools of that city. His accident was subject to a different rule than are accidents of those who work by the hour or day. The duties he owed to his employer were continuous and his compensation was reckoned by the year. At the time he received the injuries resulting in his death, he was on his way to Kokomo for the purpose of attending a meeting of school officials where there was to be "a general discussion of school problems," which it was undoubtedly thought would result in mutual benefit to the school city and the superintendent, but in addition to this, there was the further purpose of investigating the qualifications of the applicant for a position as teacher in the school. The record shows that the journey was not being made by Williams voluntarily and wholly for his personal benefit.

In the case of *Mann* v. *Board of Education, etc.* (1934), 266 Mich. 271, 253 N. W. 294, the claimant's decedent was principal of a high school in the city of Detroit. While on his way to Ann Arbor, he received

fatal injuries in an automobile accident. He was traveling in response to an invitation from the registrar of the University of Michigan to confer with freshmen at the university who had graduated from the high school of which he was principal, and check on the records of such graduates, so that if there were any deficiencies in the preparation of students in the high school in question, they might be checked on and corrected. This plan originated with 'the officers of the university and attendance thereat was wholly voluntary. The facts in the Mann case were not as favorable to the claimant as in the case at bar.

The Supreme Court of Michigan, in holding that the claimant was entitled to compensation, said (pp. 273-274) : "Mr. Mann was under no compulsion to attend the meeting. His superior officer, the superintendent, recognized the benefit to the school system in having him attend, and was willing that he go without leave and on school time, but at his own expense.

"One purpose of high school education is to equip graduates for entry to the university and the meeting was in the nature of survey of practical results of such purpose. The scheme was of intended benefit to the high school system as well as to principals in charge thereof. Attendance, while voluntary, arose out of employment as a principal and we can readily so hold, but whether such voluntary attendance was in the course of the employment as principal is a more difficult question.

"At the time of the accident Mr. Mann was not exercising a personal privilege wholly apart from his employment or his employer's interest, but was about the performance of an act, incident to and recognized as of value by his superior in connection with high school purposes.

"Under the facts and applicable law we think the in-

jury arose out of and in the course of Mr. Mann's employment."

In the case of *Smith* v. *Seamless Rubber Co.* (1930), 111 Conn. 365, 150 Atl. 110, 69 A. L. R. 859, the court stated the line of demarcation between compensable and non-compensable cases, in classes analagous to the case at bar in clear and concise language as follows (pp. 368-369) : "Where an employer merely permits an employee to perform a particular act, without direction or compulsion of any kind, the purpose and nature of the act become of great, often controlling significance in determining whether an injury suffered while performing it is compensable. If the act is one for the benefit of the employer or for the mutual benefit of both an injury arising out of it will usually be compensable; on the other hand, if the act being performed is for the exclusive benefit of the employee so that it is a personal privilege, or is one which the employer permits the employee to undertake for the benefit of some other person or for some cause apart from his own interests, an injury arising out of it will not be compensable."

Counsel for appellee, in the argument appended to their brief, say: "Furthermore it is not sufficient merely to show that the deceased was injured while in the course of his employment but it must further appear that the injury arose out of the employment. In other words, it must appear by a preponderance of the evidence that there is some causative connection between the injury and something peculiar to the employment. It must arise out of some causative danger peculiar to the work and not common to the neighborhood."

In the case of *Kyle* v. *Greene High School* (1929), 208 Ia. 1037, 1040, 226 N. W. 71, after stating that "It is a well settled general rule that an injury suffered by an employee in going to or returning from the employer's premises, where the work of the employment is carried

on, except in special instances, does not arise out of his employment so as to entitle him to compensation," said, "An exception to the aforesaid general rule is found in cases where it is shown that the employee, although not at his regular place of employment, even before or after customary working hours, is doing, is on his way home after performing, or on the way from his home to perform, some special service or errand, or some duty incidental to the nature of his employment in the interest of, or under direction of, his employer. In such cases, an injury arising en route from the home to the place where the work is performed, or from the place of performance of the work to the home, is considered as arising out of and in the course of the employment."

In the case of *Stockley* v. *School District No. 1, etc.* (1925), 231 Mich. 523, 204 N. W. 715, where the facts were without conflict and quite similar to those in the case before us, the Supreme Court of Michigan said (pp. 530-531): "It is also contended, even if in the course of her employment deceased's injury did not arise out of it, because she had not arrived at, but was only on her way to, the place of holding the institute, in support of which counsel cite decisions to the generally accepted rule that when an employee is injured away from his place of employment and employer's premises, while going to or returning from his work, the injury does not arise out of his employment. Various exceptions to the general rule are found in cases where it is made to appear that the employee, although away from his regular place of employment, even before or after customary working hours, was doing some special service or discharging some duty incidental to the nature of his employment in the interest of or under direction of his employer. . . . The criterion is not necessarily that others are exposed to the same dangers of travel, but whether with reference to the

nature of his employment the performance of a special service within the scope of such employment, in the interest of or by direction of his employer, particularly subjects an employee to the added danger out of which the accident arises."

This court in the case of *In re Harraden* (1917), 66 Ind. App. 298, 304, 118 N. E. 142, said: "While recognizing the general rule above stated, there are many cases which the courts hold are not governed by it, or that they are controlled by well-recognized exceptions to such general rule. Where the employment of the injured person requires him to be at the place where the injury is received, and he is in fact at such place in pursuance of the discharge of the duties of his employment, the risk thereby encountered is held to be incident to such employment, though the injury may have resulted from conditions produced by the weather to which persons generally in that locality were exposed. Where the duties of the employee require him to travel and visit different places in order that he may discharge the duties of his employment, his place of work is thereby enlarged or extended to include all the places to which such employee necessarily goes in discharging the duties of his employment. While the conditions produced by the weather may in a sense affect all alike in the particular vicinity, yet the fact remains that a person so employed is much more exposed to such hazards than the public generally because of the duties enjoined upon him by his employment and the place or places to which he must necessarily go in the discharge of such duties."

In *Empire Health, etc., Co.* v. *Purcell* (1921), 76 Ind. App. 551, 555, 132 N. E. 664, this court declared the rule to be that: "The words 'by accident arising out of and in the course of his employment' as used in Workmen's Compensation Act (Acts 1915, p. 392, §80201 et seq. Burns' Supp. 1918), should be given a liberal

construction in order that the humane purpose of their enactment may be realized. An accident is said to arise out of the employment when there is a causal connection between it and the performance of some service of the employment. The causal relation is established when the accident is shown to have arisen out of a risk which a reasonable person might have comprehended as incidental to the employment at the time of entering into it, or when the evidence shows an incidental connection between the conditions under which the employee works and his resulting injury."

For cases of similar import see *Howell* v. *Kingston Township, etc.* (1932), 106 Pa. S. Ct. 89, 161 Atl. 559; *Bocock* v. *State Board, etc.* (1934), 55 Ida. 18, 37 Pac. (2nd) 232; *Garris* v. *Peoples, etc.* (1934), 162 Va. 428, 174 S. E. 665; *Jones* v. *Planters, etc., Co.* (1934), 206 N. C. 214, 173 S. E. 595.

We recognize and adhere to the well established rules, that the finding of facts and the award of the Industrial Board based thereon are binding upon this court and will not be disturbed when supported by any competent evidence, but that it must be supported by some competent evidence; that the award cannot be upheld where it is dependent upon facts arrived at by mere guess, surmise, conjectures or possibilities, *Pioneer, etc., Co.* v. *Hardesty* (1921), 77 Ind. App. 205, 133 N. E. 398; that this court will not weigh the evidence when it is conflicting nor will it disregard reasonable inferences which the Industrial Board may have drawn from the facts which the evidence tends to establish, but if the evidence is of such a conclusive character as to force a conclusion contrary to that reached by the Industrial Board then the duty devolves upon this court to reverse or set aside such award. *Swing* v. *Kokomo, etc., Co.* (1921), 75 Ind. App. 124, 125 N. E. 471.

We are here confronted with a record where the evidence is without conflict, and evidence which, when examined and subjected to the test of the rules of law as declared in the authorities above cited is so conclusive in its character as to force a conclusion contrary to that arrived at by the Industrial Board.

In our opinion the record conclusively shows that the appellant is entitled to compensation. The award of the Industrial Board is reversed, with instructions to the full board to set aside the award from which this appeal is taken and to enter an award in favor of appellant in accordance with this opinion and requiring that all past due payments be paid in cash in a lump sum.