(No. 6495. March 12, 1938.)

LULU ENGLAND, Respondent, v. FAIRVIEW SCHOOL DISTRICT No. 16 OF POWER COUNTY and STATE INSURANCE FUND, Appellants.

[77 Pac. (2d) 655.]

Carroll F. Zapp, for Appellants.

Anderson, Bowen & Anderson, for Respondent.

MORGAN, J.—Respondent was employed by appellant district as a teacher for the school term commencing in 1934 and ending in 1935. The schoolhouse of the district is situated about six miles from American Falls, the county seat of Power county, and about thirty miles from Pocatello. Friday afternoon, April 26, 1935, after school was dismissed, respondent went to Pocatello. There she met two men, friends of hers, Jackson and Dean by name, who were going to Salt Lake the next day. They invited her to accompany

them, and the three started to Salt Lake at 5 o'clock in the morning of April 27. While on the way, the car in which they were riding left the road and turned over, injuring respondent so seriously she was, and ever since has been, totally disabled. She made application for compensation, provided for by the workmen's compensation law. Liability was denied by appellants, and a hearing was had before the industrial accident board which disallowed compensation. Respondent appealed to the district court, which reversed the order of the board and directed it to make an award in her favor. The school district and its surety have appealed from the order of the district court.

The facts are not in dispute. Respondent desired to purchase a motto to be placed over the stage on the occasion of the graduation exercises of the eighth grade, of which she was teacher; also programs and graduation cards, and presents for the graduates. Suitable goods, of the kind desired, were not carried in stock by the stores at American Falls or Pocatello. Her purpose in going to Pocatello was to go from there to Ogden or Salt Lake, if she could secure free transportation, to buy suitable supplies for the graduation exercises. It was the custom of the school board to permit teachers to purchase such supplies, and respondent, prior to starting on the trip, had secured its permission to purchase the goods she desired, other than the presents for the graduates, the board agreeing the district would repay her the purchase price thereof. Her intention was to buy the presents at her own cost, and the district was to be out nothing for her traveling expense. The place where the goods were to be bought was not discussed between respondent and the school board. It neither authorized her to go to Salt Lake nor forbade her to do so.

The board made a ruling of law that respondent was not entitled to an award against appellants; that her claim should be denied, and her application should be dismissed. It did not find she did not suffer injuries from an accident arising out of and in the course of her employment, but appellants contend she did not. They insist it was not her duty to buy supplies to be used at the graduation exercises, and rely on I. C. A., sec. 32–1003, which is as follows:

"Every teacher shall make reports, in addition to those mentioned elsewhere in this chapter, which may be required by the state superintendent, county superintendent, or by the school district board of trustees; shall use the text books provided for the schools of the state; enforce the course of study and the rules and the regulations prescribed by the state superintendent; hold pupils to a strict account for disorderly conduct or improper language in or about the building, on the playgrounds, and on the way to and from school; shall keep himself or herself without reproach, and endeavor to impress upon the minds of the pupils the principles of truth, justice, morality, patriotism, and refinement, and to avoid idleness, falsehood, profanity, vulgarity and intemperance; give attention during every school term to the cultivation of manners, and shall, if there be a library in the school, devote not less than one hour in each week to systematically reviewing the works contained therein."

If all the duties of a school teacher are specified in that section of the statute, a pupil may become violently ill, or suffer an accident causing it serious injury or endangering its life, and its teacher may refuse to render aid or comfort to it without violating her duty. If the schoolhouse should catch fire, it will not be her duty to make an effort to extinguish it. It would be impossible for the legislature to enact a statute fixing and defining every duty which a school teacher owes to her employer and to her pupils, and it has not attempted to do so.

It is a fact, generally known, and it is shown in the record before us, that teachers' duties do not end with the school session. In *Scrivner v. Franklin School Dist. No. 2*, 50 Ida. 77, 80, 293 Pac. 666, 667, this court quoted from *Kyle v. Greene High School*, 208 Iowa, 1037, 226 N. W. 71, 72, as follows:

"An exception to the aforesaid general rule is found in cases where it is shown that the employee, although not at his regular place of employment, even before or after customary working hours, is doing, is on his way home after performing, or on the way from his home to perform, some special service or errand or the discharge of some duty incidental to the

nature of his employment in the interest of, or under direction of, his employer. In such cases, an injury arising en route from the home to the place where the work is performed, or from the place of performance of the work to the home, is considered as arising out of and in the course of the employment.''

See, also, *Zeier v. Boise Transfer Co.*, 43 Ida. 549, 254 Pac. 209; *Murdoch v. Humes & Swanstrom*, 51 Ida. 459, 6 Pac. (2d) 472; *Logue v. Independent School Dist. No. 33*, 53 Ida. 44, 21 Pac. (2d) 534; *Bocock v. State Board of Education*, 55 Ida. 18, 37 Pac. (2d) 232; *In re MacKenzie*, 55 Ida. 663, 46 Pac. (2d) 73.

In *Mann v. Board of Education of City of Detroit*, 266 Mich. 271, 253 Pac. 294, 295, the Supreme Court of Michigan quoted from *Smith v. Seamless Rubber Co.*, 111 Conn. 365, 150 Atl. 110, 111, 69 A. L. R. 856, as follows:

''Where an employer merely permits an employee to perform a particular act, without direction or compulsion of any kind, the purpose and nature of the act becomes of great, often controlling significance in determining whether an injury suffered while performing it is compensable. If the act is one for the benefit of the employer or for the mutual benefit of both, an injury arising out of it will usually be compensable; on the other hand, if the act being performed is for the exclusive benefit of the employee so that it is a personal privilege, or is one which the employer permits the employee to undertake for the benefit of some other person or for some cause apart from his own interests, an injury arising out of it will not be compensable.''

In this case the purchase of supplies was not for the benefit of respondent, nor of a third person. It was for the benefit of the school district, respondent's employer. That the sole purpose of respondent in going to Salt Lake was to make these purchases is established by her testimony and is undisputed; that suitable and satisfactory supplies could not be found nearer than Ogden or Salt Lake is also established. Whether it was wise or foolish for her to make so long a journey in the performance of her duty to make the purchase is not controlling. In *Re Stewart*, 49 Ida. 557, 561, 290 Pac.

209, 210, this court, speaking of an employee who lost his life in attempting to drive a tractor up a mountainside, said:

"We think the trial court erred in the finding complained of. Part of the *res gestae* were Stewart's last words: 'I was just trying so hard to do something.' Louder than this attestation of his dying lips were his actions undertaken in the immediate vicinity of the work going on: surely his efforts were directed to but one objective, that of contributing some measure of service to his employer's business. Conceding that he exercised defective, even reckless judgment, that could not deprive his endeavor of its primary purpose. (C. S., sec. 6214, [now I. C. A., sec. 43–902] assuring (assures) compensation 'regardless of question of fault'; *Decatur Railway & Light Co. v. Industrial Board*, 276 Ill. 472, 114 N. E. 915; *Eugene Dietzen Co. v. Industrial Board*, 279 Ill. 11, 116 N. E. 684, Ann. Cas. 1918B, 764; note, 23 A. L. R. 1163.)"

Appellants insist if respondent was justified in going to Salt Lake to purchase supplies for the district, she might, with equal propriety, have gone to San Francisco or some other distant point for the same purpose. This contention is not sound. Had the accident not occurred it would have been possible for respondent to have made the trip, as the record shows she planned to do, to Salt Lake and to have returned to her place of employment the same day. The trip, had it been completed according to her plans, would not have been violative of, nor inconsistent with, her duties to her employer. (*Ocean Accident & Guarantee Corp. v. Industrial Com.*, 32 Ariz. 265, 257 Pac. 641.)

The facts, proven by undisputed evidence, and found by the board, establish that respondent was injured by accident arising out of and in the course of her employment by appellant school district.

Over objection by counsel for respondent, appellants were permitted to prove that shortly after the accident Jackson, one of the men with whom respondent was riding, was arrested and entered a plea of guilty to a charge of "parading the public highway in an intoxicated condition," and that Dean, the man who was driving the car, was arrested and charged with driving a motor vehicle on the public highway

while under the influence of intoxicating liquor, to which he entered a plea of guilty; also that the vehicle which he was accused of driving, while in such condition, was the car in which respondent was riding at the time of the accident.

The board found the above statements, with respect to the intoxication of the two men, to be true. Said testimony was entirely irrelevant and immaterial. This is not a negligence case. It is one involving the right to compensation, provided for in the workmen's compensation law. It does not involve a question as to who was to blame for the accident. The undisputed evidence shows respondent had not partaken of intoxicating liquor and was not under its influence. Furthermore, it has not been contended by appellants, either in their answer or elsewhere, that she had drunk intoxicating liquor or was intoxicated. The facts of the case do not bring it within the provisions of I. C. A., sec. 43–1002, as follows:

"No compensation shall be allowed for an injury caused:

"1. By the employee's wilful intention to injure himself or to injure another; or,

"2. By his intoxication."

That section further provides: "If the employer claims an exemption or forfeiture under this section the burden of proof shall be upon him."

The order of the district court is affirmed.

Holden, C. J., and Givens, J., concur.

AILSHIE, J., Dissenting.—I am unable to agree to an affirmance of the judgment of the district court and thereby reverse the order of the industrial accident board in this case. I fail to find anything in the record that, to my mind, justifies the conclusion that the accident here complained of "arose out of and in course of her employment" as a teacher.

It is true that a teacher is required to do a great many things in the full discharge of her duties that cannot well be done during school hours at the schoolhouse or on the school grounds. It does not follow, however, that, without special direction or authority to that end, she may travel beyond the confines of her district, county and state to a city 195 miles distant to make a few purchases which might well have been

secured through the due course of mail. It is admitted she had authority to make the purchases in question, but it is equally true that the trustees neither authorized this trip nor knew she meant to make a trip to Salt Lake for this or any other purpose.

In order that the facts, which influence my judgment, may clearly appear, I am quoting all the material parts of Miss England's testimony and also that of Mr. Geesey, chairman of the board of trustees, and Mrs. Butler, county superintendent of schools, who testified as follows:

Miss England:

"Q. You stated you left Fairview and went some place on Friday the 26th?

"A. I came to Pocatello.

"Q. What time did you leave Fairview?

"A. As I remember it was about five thirty.

"Q. How did you leave there?

"A. With Pete Farwell in his car. He was coming down. He was a bus driver.

"Q. You came to Pocatello?

"A. Yes.

"Q. What did you come to Pocatello for?

"A. I was planning to go to Salt Lake if I could, to get some supplies for my graduation exercises. I had not been able to get all the things I wanted and I thought perhaps if I got to Pocatello, I could find a way to either Salt Lake or Ogden and could buy these supplies much better because I couldn't find what I wanted here or in American Falls.

"Q. When was it you decided to go to Salt Lake?

"A. After we came to Pocatello. I saw Mr. Jackson and Mr. Dean and he said he had to go to Salt Lake to get some supplies for his business and of course when I knew he was going, I asked if I could go with them. They decided to go the next day and were coming back right away and that would give me time to get them and get back and take care of my school work besides.

"Q. You spoke something about getting some graduation things or some supplies, what did you intend to get?

"A. A motto for across the front of their stage and I couldn't get that at American Falls and I wanted to get graduation cards for the exercises and some presents for my graduating class.

"Q. Before you left the school had you made any arrangements to get these articles?

"A. I wrote my cousin in Preston and asked her for a book on graduation exercises and I was going to stop and get that.

"Q. Is she engaged in teaching school?

"A. Yes, for several years.

. . . . . . . . . . . . . . .

"Q. Did you have any other business in mind in making the trip other than for the reasons you have already stated?

"A. No.

. . . . . . . . . . . . . . .

"Q. After Mr. Jackson got through with his work what did you do then?

"A. Drove around for a while and the boys asked me—we were talking about this trip—and they asked me if I cared to go and I said I did as that was my main reason for coming to Pocatello.

"Q. Had you communicated with either of these boys before coming in?

"A. I had not.

"Q. *When you came in you didn't know that you were going?*

"A. *I did not.*

. . . . . . . . . . . . . . .

"Q. When Jackson finished his conference with the carpenters, then what did you do?

"A. Went out in the car and drove around and we talked about our trip to Salt Lake and we decided when we better start.

"Q. How long did that take? How long did you drive around and talk about the trip?

"A. I can't be sure.

"Q. An hour?

"A. It was probably longer than that.

"Q. Two hours?

"A. Perhaps.

"Q. Can you fix a definite time—could it have been four or five or six?

"A. No, it wasn't that long. I don't know how long we stayed at the stand or how long we drove around.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. Did you have any conversation with them [Jackson and Dean] when they came outside the house that morning?

"A. Surely.

"Q. What about?

"A. Everything.

"Q. Including what?

"A. Most of the time we were talking about our trip, when we expected to get there and when we would get back. I told them it was imperative I be back in American Falls that night.

"Q. You observed them while you were talking to them?

"A. I did.

"Q. Would you say Mr. Dean was drunk or sober?

"A. I would say he was sober.

"Q. Did you have a bottle of whiskey in the car with you that morning?

"A. We did not.

"Q. Any beer?

"A. No.

"Q. No intoxicating beverages at all?

"A. No, nothing in the car.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. What do you call your graduating class the seventh and eighth grade?

"A. No, the five in the eighth grade.

"Q. You were going to buy presents for them?

"A. Yes.

"Q. How much were you going to spend for this?

"A. I was going to look around to see first.

"Q. You were paying for those out of your own pocket?

"A. Yes, for the presents.

"Q. Who was paying for the other things you were going to get?

"A. The trustees were to pay for the other things.

. . . . . . . . . . . . .

"Q. Well then you were going down to Preston for the express purpose of getting a book containing ideas about commencement exercises and you were going to go on from there either to Salt Lake or Ogden to buy graduating presents for five grade school pupils?

"A. I was, and to buy other material for my graduation. I wanted programs and the class motto for .across the front of the stage.

"Q. You were going all the way down there to get that material?

"A. I was.

. . . . . . . . . . . . . .

"Q. None of the members of the school board ordered you. to go to Preston?

"A. They didn't order me to, no.

"Q. Did you talk it over with them?

"A. The school board told me I could get material I saw fit for the graduating exercises.

"Q. *Did they tell you where to get it?*

"A. *They didn't usually stipulate the store I was to shop at.*

"Q. *Did you tell them you were going to get it?*

"A. *I did not.*

"Q. At the time you left did any of the members of the school board know you were going to Preston to get this book and then on to Ogden and Salt Lake?

"A. They knew I was going to Pocatello. I didn't know for sure I was going on myself. I had to wait until I found a way down.

"Q. You had not talked it over with them?

"A. No more than they had told me to go ahead and get the material I told them I needed.

"Q. Where did you usually get your supplies?

"A. I never had had a graduation class before.

"Q. Never bought any supplies for the school previously?

"A. I had bought supplies but not graduating supplies.

"Q. Did you expect the school board to reimburse you for any expenses you incurred on this trip?

"A. I did.

"Q. Did you expect the school board to pay for your meals?

"A. No.

"Q. What expenses did you expect the board to reimburse you for?

"A. For all material I bought for the school.

"Q. Nothing for your traveling expenses?

"A. No. Because I was going to go with friends and if I didn't go with friends I couldn't afford the trip."

Mr. Geesey:

"Q. What—state if you know whether or not there were occasions when teachers over which you were trustee ever made purchases and presented the bill to you, which was paid?

"A. I do.

"Q. That was the custom, was it?

"A. For smaller articles, yes.

"Q. Do you happen to know if Miss England ever made purchases of supplies for small articles and presented the bill to you and it was paid?

"A. I do.

"Q. Was the bill paid?

"A. Yes.

"Q. Was it part of Miss England's duties to buy presents for the members of the graduating class?

"A. Not as far as the school board was concerned.

"Q. Had the school board ever ordered her to buy things for the graduating class?

[Objection sustained to this question.]

"Q. If you know, had the school board given Miss England any instructions to go to Preston or on to Logan or Salt Lake to buy any presents?

"A. They had not.

"Q. If you know, did Miss England take up the matter of buying any supplies with the school board?

"A. She had.

"Q. When was that?

"A. I think it was when we hired her for the following year.

"Q. When was that?

"A. Right after the school election, a week or such a matter.

"Q. When was that?

"A. I can't state the exact date.

"Q. This year?

"A. Yes.

"Q. What was said in that conversation?

"A. I am sure I couldn't repeat it.

"Q. In substance, if you remember?

"A. She wanted to know about getting a few articles for commencement exercises and we told her to get any small articles she might want and we would reimburse her for them.

"Q. Did you tell her where to get them?

"A. We did not.

"Q. Did she say where she was going to get them?

"A. She did not.

"Q. Miss England was hired by the school board of which you are chairman?

"A. She was.

"Q. You supervised the activities and duties of Miss England?

"A. The Board as a whole did that.

"Q. Did the Board as a whole give her her orders respecting her duties and activities with the school?

"A. They did."

Mrs. Butler:

"Q. Assuming that a teacher would leave her school room on a day other than a school day to purchase presents for her graduating class which she may have graduating from her school and in connection with school supplies, state whether or not in your opinion such duty would be considered by you in the scope and line and course of her employment?

"A. I would say 'yes.'

"Q. Would you say a teacher, teaching a graduating class in the grade school at Fairview District, having five pupils in her graduating class, would be in line of her duties if she went to San Francisco to get some presents for the graduating class?

"A. To San Francisco?

"Q. Yes.

"A. No.

"Q. Where did the various school districts in your county ordinarily obtain their supplies?

"A. From the Caxton Printers at Caldwell and Syms-York at Boise and John Graham's in Spokane.

"Q. They order them by mail?

"A. Very often, if they can get them that way.

"Q. Small, minor purchases, where did the average teacher go to get such supplies?

"A. Quite often to Pocatello.

"Q. Very often to American Falls?

"A. Very seldom because the supply there is so limited.

"Q. They have a very good supply in Pocatello?

"A. Not especially. Material can be obtained here.

"Q. When they need emergency supplies, they write in to Pocatello?

"A. Unless they happen to have it within their means to go somewhere else for them.

"Q. Do you know anybody else that went any place other than Pocatello?

"A. I don't.

"Q. What do you mean then?

"A. I said unless they could go some place else.

"Q. Where could they go?

"A. Salt Lake, Ogden, or Boise.

"Q. Is it customary among the school teachers in your district, for the grade school teachers, to go down to Salt Lake without consulting the school board to buy supplies?

"A. No."

Now, since nothing was said about this teacher making the trip to Salt Lake or Ogden, for the purpose of securing these supplies, it follows that nothing could have been said about

the mode of transportation she would adopt; and of course it must be conceded that there is a very great difference as to degree of safety between the kinds of transportation that might have been selected.

While the board might have been willing to assume the risks and hazards of a teacher driving an automobile or riding with someone else, six miles distant to American Falls or thirty miles distant to Pocatello, they might not have been willing to risk the added hazards of the teacher hitch-hiking or soliciting a free ride and the attendant risks on a 195-mile jaunt to Salt Lake City. The point I would make, by this course of reasoning, is very well illustrated by the evidence of the intoxicated condition of the driver and his companion with whom claimant rode from Pocatello to the time of the accident. Following this accident, and on the same day, Dean, who was driving the car at the time of the accident, was arrested and taken before a justice of the peace at Pocatello, charged with driving a motor vehicle on a public highway while under the influence of intoxicating liquor, to which charge he plead guilty and was fined $100 and costs. At the same time his companion, Jackson, was arrested and taken before the same court on the charge of "parading the public highway in an intoxicated condition," to which charge he plead guilty and was fined $10 and costs.

Now, it is said by Mr. Justice Morgan, in his opinion, that "Said testimony was entirely irrelevant and immaterial. This is not a negligence case. It is one involving the right to compensation, provided for in the workmen's compensation law. It does not involve a question as to who was to blame for the accident." I fully agree with the propositions enunciated in the foregoing quotation, to the effect that *negligence* was not an issue in the case; but I do not agree that the evidence was not admissible or competent to be considered by the Board, where the trip was undertaken as it was here by the claimant *without any express authority and with no apparent implied authority*. If claimant was traveling in the course of her employment in this particular case, it necessarily follows that she had a right to select anybody she pleased with whom to ride, or any other possible mode

of transportation. She might ride on the railway train, the motor bus, by airplane, with a friend, an inebriate stranger, "hitch-hike," or drive her own conveyance. The board might be willing to extend this latitude of choice in selection to an employee for making a short-distance trip, within the immediate territory of employment, and, at the same time, be unalterably opposed to authorizing extension of the trip some hundreds of miles over dangerous roads and by still more hazardous means of transportation. I cannot think that authority to travel, from the schoolhouse, six miles to American Falls or a distance of thirty miles to Pocatello, could reasonably be extended, by inference or implication, to a trip extending to Ogden or Salt Lake (or it might as well have been to Butte or San Francisco, by plane) by such a hazardous and promiscuous means of transportation.

Counsel for claimant have called our special attention to *Williams v. School City of Winchester,* (Ind. App.) 10 N. E. (2d) 314, as a case in point here, supporting the contention that claimant is entitled to compensation. As I read and understood that case, however, it is decisive of the very point in question here, as it turns on the authority granted by the board of trustees to the claimant to make the trip. Williams was superintendent of the School City of Winchester, Indiana. It was the duty of the superintendent to investigate and report on applicants for employment as teachers in the schools. They had an application from a teacher who lived at Greentown, a short distance from Kokomo. A meeting of school officials was to be held at Kokomo and the trustees of School City of Winchester concluded it would be a good idea for the superintendent to go over and attend the meeting and, in that way, he might be able to learn something about the applicant from Greentown. One of the board of trustees testified:

"We thought it would be a good idea for him to attend this meeting because he was investigating teachers at that time and on this particular trip he could find out more about a teacher that he was interested in."

Williams started and was killed in an accident while on the trip. The Indiana court held that the accident occurred in

and arose out of, the course of the employment of the superintendent and that the widow was entitled to compensation.

We have a very different case here. None of the Idaho cases go to the extent contended for here.

The judgment of the district court should be reversed and the order of the Board affirmed

I am authorized to say that Mr. Justice Budge concurs in this dissent.