### PRATER *v.* INDIANA BRIQUETTING CORPORATION.

[No. 768A119. Filed April 8, 1969. Rehearing denied May 7, 1969. Transfer granted October 30, 1969.]

*Graham, Rasor & Harris,* of Warsaw, for appellants.

*Hunt, Suedhoff & Wilks,* of Fort Wayne, for appellee.

PFAFF, C. J.—This is an action brought by the appellants, Virginia Prater and Virginia Prater, as Natural Guardian of Mark Prater, a Minor, against the appellee, Indiana Briquetting Corporation, under the Indiana Workmen's Compensation Act for death benefits. Hearing was had before a single member of the Industrial Board on February 8, 1968, and the appellants were awarded nothing by way of their application. Review was had before the Full Board and the following finding and award entered:

"That on November 3, 1966, one Earmon Prater, plaintiffs' decedent was in the employ of the defendant at an average weekly wage in excess of $75.00; that on said date the said decedent was involved in an accident, which resulted in

his immediate death on said date; that at the time of his said accident and death, the said decedent was engaged in a personal mission of his own, and that his said accidental injury and death did not arise out of and in the course of his employment with the defendant herein.

"The Full Industrial Board of Indiana now finds for the defendant and against the plaintiffs on plaintiffs' Form 10 application of dependents of deceased employee to the Industrial Board for the Adjustment of Claim for Compensation filed August 15, 1967.

"AWARD

"IT IS, THEREFORE, CONSIDERED, ORDERED AND ADJUDGED by the Full Industrial Board of Indiana that the plaintiffs shall take nothing by virtue of their Form 10 application heretofor[e] filed August 15, 1967.".

Appellants assign as error that the decision of the Industrial Board is contrary to law.

The evidence discloses that on November 3, 1966, appellants' decedent, Earmon Prater, was employed by the appellee and was working the night shift, which ran from five o'clock P.M. until five o'clock A.M. At approximately eight forty-seven o'clock P.M. on the night in question, appellants' decedent was struck and killed by a train while crossing the railroad tracks which lay between appellee's plant and a building known as "Woodie's Rent-It". The evidence also discloses that at the time of his injury and death, Earmon Prater was on an "informal break" from his employment as permitted by appellee, and was crossing the railroad tracks on a mission to secure soft drinks for himself and another night employee from a soft drink machine outside Woodie's Rent-It. Appellee's plant manager testified to an unwritten policy against employees leaving the premises except at lunch periods, and denied knowledge that the policy was not observed.

The sole issue presented by this appeal is whether the decedent's injuries arose out of and in the course of his employment.

In discussing this issue, we look to a recent opinion of this court wherein Judge Cooper presented an excellent review of the Indiana authorities pertinent to the question raised in this appeal. In *B.P.O. Elks, #209 v. Sponholtz* (1969), 144 Ind. App. 150, 244 N. E. 2d 923, 16 Ind. Dec. 586, Judge Cooper stated:

"Under the authority of the Workmen's Compensation Act, and many cases decided by both the Supreme Court of Indiana and by this Court, it was the burden of the appellee herein to establish before the Industrial Board by evidence of probative value, free from conjecture, surmise, or mere guess, that the appellee suffered his injuries or met with his accident, while in the course of his employment, and under conditions which may be reasonably considered as incidental to his employment, or as having an incidental connection therewith . . ."

In discussing the exact issue presented in this appeal, the court, in *B.P.O. E.ks, #209 v. Sponholtz, supra,* quotes from the case of *Williams v. School City of Winchester* (1937), 104 Ind. App. 83, 95, 10 N. E. 2d 314, in resolving the question of what constitutes an accident arising out of and in the course of employment. The court in *Williams* stated:

"An accident is said to arise out of the employment when there is a causal connection between it and the performance of some service of the employment. The causal relation is established when the accident is shown to have arisen out of a risk which a reasonable person might have comprehended as incident to the employment at the time of entering into it, or when the evidence shows an incidental connection between the conditions under which the employee works and his resulting injury."

It was, therefore, incumbent upon the appellant in the instant case to show that the injuries were sustained in the performance of a duty or duties required by the employer, and that the risk undertaken at the time of the accident was beneficial to the employer and was required by, or incidental to, that work which normally constituted the basis of his employment.

In applying our compensation laws to the evidence of this case, it is our conclusion that there is no reversible error and that the evidence of the decedent's personal mission at the time of the accident in question sustains the award of the Industrial Board. As stated in *Pittsburgh Testing Laboraories v. Kiel* (1960), 130 Ind. App. 598, 167 N. E. 2d 604:

"An accident occurring while an employee is going to or returning from his place of employment, or which occurs while the employee is engaged on a personal mission or errand, not connected with the duties of his employment, is not within the protection afforded employees by the Indiana Workmen's Compensation Act."

In *Gill v. James A. Gill & Sons etc.* (1959), 130 Ind. App. 1, 4, 159 N. E. 2d 734, this court stated:

"The question of whether or not an injury arises out of and in the course of the employment is a question of fact. The burden of establishing such fact rests upon the claimant and on appeal we may view only that evidence most favorable to the appellee. *Kinsey v. Sheller Manufacturing Corp.* (1955), 125 Ind. App. 493, 499, 126 N. E. 2d 267.

"A finding and award will not be disturbed upon the evidence unless it is of such a conclusive nature with all inferences reasonably deducible therefrom as to force a conclusion contrary to that reached by the Board. *U.S. Steel Corp. v. Dykes* (1958), 238 Ind. 599, 154 N. E. 2d 111."

In the case at bar the full Industrial Board found that the decedent's injuries did not arise out of and in the course of his employment. In the opinion of this court, the evidence was sufficient to support the award of the Full Board, and we cannot say that as a matter of law we would have been forced to reach a contrary conclusion.

Finding no reversible error, the award of the Full Industrial Board of Indiana is hereby affirmed. Costs are taxed against appellants.

Lowdermilk, P.J., and Carson, Cooper, Hoffman and Sulli-

van, JJ., concur; Sharp , J., dissents with opinion in which White, J., concurs.

## DISSENTING OPINION

SHARP, J.—I must respectfully dissent from the majority opinion in this case. I will not burden this opinion with citations calling for a liberal and broad construction of the Workmen's Compensation Act, although they are basic to my position in this case.

It should also be emphasized this is not a case involving the violation of a reasonable written or printed work rule under Burns' Ind. Stat. Ann., § 40-1208.

In addition to the evidence suggested in the majority opinion, it also is undisputed that the plant manager himself had sent Appellant's decedent and other employees to the same soft drink machine at Woodie's Rent-It, which was just across the railroad tracks from the plant. There was no soft drink machine on Appellee's premises. The decedent was on the night crew and there was no supervision of that shift. The decedent and one other employee were the only persons working on the night in question. Specifically the plant manager testified:

Q You mentioned Woody's. Is this where the fellows generally got cokes?

A Uh-huh. He had an outside machine, and still has.

Q I am not sure of one thing. You have said that you were aware they went and got cokes on their lunch period over here. Were you aware that went on day or night, they went and got them occasionally when they would take a break?

A Well, I hoped that, being a good boss, a lot of times, I would send them to get cokes or something. Being hot, I would send them down after root beer and coffee and doughnuts, every now and then.

Q On occasion other than lunch period?

A Yes, other than lunch period.

Q Did you ever give them any instructions not to go get cokes?

A Yes, I did. This was understood policy. You mean not to get cokes. I gave them authorization not to leave the plant other than at their lunch, when they had their lunch half hour.

Q You are telling me what you did tell them.

A This is what they had, no authorization to leave the plant. It took the men there to keep it running. They knew there was no time for them to be running around during working hours other than when they had their half hour for lunch. That was the understanding we had. This they understood.

Q Did you yourself tell this to Earmon Prater?

A You want to know if I remember it personally if I told it to him?

Q Yes.

A I think did, because I had told them, because he worked for me a year or so before. And this was understood policy that they knew. Being crane operator that was working on that shift, he understood this policy.

Q Wouldn't as a matter of course sometimes the crane operator come over and relieve the other operator so he could go get coke or his coffee or something like that?

A Not to my knowledge this was being done. Because the crane operator had his own work to do. And the only time relief he was to give the press operator was during this half hour for lunch.

Q I am still interested in whether you recall specifically whether you yourself ever told Earmon Prater that he was not to leave the premises except during lunch hour.

A Well, to be honest—

Q If you don't recall, say 'I don't recall.'

A But it was such a standard policy, and it was understood by everybody else, that I can see no reason why he would not have understood the policy as such.

Q Do you have any idea of how Mr. Prater found out where to go to get cokes?

A Well, I am sure that this Del Ousley, I know, would drink two or three bottles of pop every half hour when he has his lunch—half hour lunch.

Q Would he at other times at the time he was working, too?

A There's a possibility. I wasn't there to observe all the time.

Q You were aware, were you not, there is a well-defined path across the railroad to Woody's from your plant?

A I left that path especially for Art Wise, the Pennsylvania agent, so he could come through and check my cars. If you ask Art Wise, you can find out.

Q Did you ever post a written notice employees were not to leave the plant?

A To my knowledge, not at that time. It was pretty well understood verbal."

The total work force in this plant was four or five people. One employee at Woodie's testified that employees of Appellee "quite frequently" came over to get cokes from the coke machine, that it happened about every day and was not limited to any particular time of the day. This witness had worked at Woodie's Rent-It for three years.

The investigating police officer testified there was a path from Appellee's plant to Woodie's which was frequently used.

A Mr. Ousley, the other employee of Appellee present on the night in question, testified he was aware of a "policy" against leaving the premises but no one had ever told him employees should not go to Woodie's. He further testified that on breaks employees normally went to Woodie's for cokes, which practice had continued three or four years prior to decedent's death.

The question is whether the decedent's death was "death by accident arising out of and in the course of employment" within the meaning of Burns' Ind. Stat. Ann., § 40-1202.

In *Lasear, Inc. v. Anderson*, 99 Ind. App. 428, 434, 192 N. E. 762, 765 (1934), this court stated:

"Generally, an accident may be said to arise out of the employment, where there is a causal connection between

it and the performance of some service of the employment. Causal relation is established when the accident arises out of a risk which a reasonably prudent person might comprehend as incidental to the employment at the time of entering into it, or *when the facts show an incidental connection between the conditions under which the employee works and the injury*." (Our emphasis added.)

Some fifty years ago, early in the history of the Workmen's Compensation Act in Indiana in *Holland-St. Louis Sugar Co. v. Shraluka,* 64 Ind. App. 545, 549, 116 N. E. 330, 331 (1917), this court stated:

"Such acts as are necessary to the life, *comfort* and convenience of the workman while at work, though personal to himself, and not technically acts of service *are incidental to the service*; and an accident occurring in the performance of such acts is deemed to have arisen out of the employment. Such acts are regarded as inevitable incidents of the employment, and accidents happening in the performance of such acts are regarded as arising out of *and in the course of employment*." (Emphasis added.)

For subsequent reaffirmation of this doctrine, see *Wasmuth-Endicott Co. v. Karst,* 77 Ind. App. 279, 133 N. E. 609 (1922), *Vendome Hotel, Inc. v. Gibson,* 122 Ind. App. 604, 105 N. E. 2d 906, (1952), and *National Biscuit Co. v. Roth,* 83 Ind. App. 21, 146 N. E. 410 (1925).

In *United States Steel Corp. v. Brown,* 142 Ind. App. 18, 231 N. E. 2d 839, 841 (1967), this court stated:

"Whether the accident occurred 'on' or 'off' the premises is but one factor among many which we must consider in determining if a causal relation between the accident and employment exists."

As stated in *National Biscuit Co. v. Roth, supra,* an employee will not be deemed to have left the scope of his employment if he is doing "what he might reasonably have been expected to do" or "what might have been anticipated by a reasonable person familiar with all the circumstances and conditions of the working place and the nature of the work."

If the decedent's trip for cokes had been unusual or singular, he might not have been reasonably expected to make such a trip. Instead, it is undisputed these trips were a normal, regular and well established practice for three or four years, numerous ones at the instance of the plant manager. Thus the professed lack of knowledge by the plant manager would not place the decedent outside the category of doing what he might reasonably be *expected* to do. In a modern industrial plant a trip for a coke is as reasonably expected as a trip to the men's rest room. Lack of knowledge by the plant manager does not defeat the claim where the decedent was doing precisely what might have been anticipated by a reasonable person familiar with all the circumstances and conditions of the working place. See *In re Loper*, 64 Ind. App. 571, 116 N. E. 324 (1917); *Kokomo Steel and Wire Co. v. Irick*, 80 Ind. App. 610, 141 N. E. 796 (1923).

The majority relies upon Judge Cooper's opinion in *B.P.O. Elks #209 v. Sponholtz*, 144 Ind. App. 150, 244 N. E. 2d 923 (1969), in which case this court reversed the award of the Industrial Board in favor of the claimant. At page 928 of 244 N. E. 2d, it is stated:

> "The appellee contends in his brief that because he sustained his injuries when he was on his way back to his place of employment, that his injuries arose out of, and in the course of his employment. With this contention we cannot agree. From the evidence in the record it appears that the Appellee left the club premises on his own volition 'to get a little fresh air and to drive around a little bit.' There is nothing in the record to show, nor from which an inference could be drawn, that during the appellee's two and a half hour jaunt around the City of Anderson, he was performing any duty on behalf of his employer, or that his driving around was required by, or incidental to, the task he was employed to perform.
>
> "Therefore, since appellee's driving around was in no way connected with his employment, we cannot hold that his injuries were sustained while in the course of his employment because the accident occurred while he was on his way back to his place of employment."

The inferences in the instant case are completely contrary to those in the *B.P.O. Elks* case, *supra,* and demand a contrary result.

I believe the uncontradicted evidence leads inescapably to the sole conclusion that the decedent was killed while in the course of his employment. The decision of the Industrial Board should be reversed.

White, J., concurs.

NOTE.—Reported in 246 N. E. 2d 206.