CHILDREN'S BUREAU OF DELAWARE v. ANNA L. NISSEN.

*(December* 30, 1942.)

LAYTON, C. J., RODNEY and TERRY, J. J., sitting.

*William H. Bennethum* (of Marvel and Morford) for the appellant.

*Percy Warren Green* for the appellee.

Superior Court for New Castle County, November Term, 1942.

LAYTON, Chief Justice:

Children's Bureau of Delaware, formerly known as

"The Delaware Society for the Prevention of Cruelty to Children," is a body corporate under the laws of this State, its general object and purpose being to provide effective means for the prevention of cruelty to children and to enforce all laws enacted for their protection. The corporation is managed by a board of governors and the usual executive officers, and is empowered to employ such agents as may be deemed necessary. Rev. Code, Ch. 70, Art. 4.

Rowena Nissen, an employee of the Bureau, was killed in an automobile accident. Anna L. Nissen, the mother of the deceased employee, filed a claim for compensation before the Industrial Accident Board, based on dependency, under section 6081, Sec. 11(8) of the Code, which authorizes, in the absence of widow, widower or children, an award of compensation to the father and mother, or the survivor of them, if dependent to any extent upon the employee for support at the time of death.

A majority of the Board found that the deceased employee was killed by accident "arising out of and in the course of his employment" (Rev. Code, § 6072, Sec. 2); and that the claimant was partially dependent upon the deceased for support at the time of her death. An award of compensation was made. The employer appealed on the ground that the evidence did not support either basis of the award.

On June 1, 1939, the deceased was employed by the Bureau as a social worker at a salary of $100 a month for eleven months of the year. At that time she was a student at the Pennsylvania School of Social Work, and had planned to complete her course of study at the school during the following year. Before her employment with the Bureau, she had arranged to read a paper relating to her experience at the Pennsylvania School and her field work at the School of Delaware at a National Convention of Social Workers to be held at Buffalo, New York, in the latter part of June; and as far back as April she had announced her intention to at-

tend the convention to which she was a delegate representing the Pennsylvania School. It was the policy of the Bureau to allow as many as possible of its staff, based on the amount of money available, to attend such conventions; and the selection of its representatives depended, in general, on the length of service. The Bureau had arranged for its representation at the convention by three of its older employees or officers, and for their travel to Buffalo in an automobile of the Bureau; and to these an allotment of money had been made for their expenses. The matter of Miss Nissen's attendance at the convention was considered by the Bureau's officers. Her desire and purpose, and that she was a delegate representing the Pennsylvania School, were known. It was decided that she could go to the convention with the Bureau's representatives, she to pay her proper share of the running expenses of the automobile. She was allowed nothing for her expenses for the reason, as was testified, that she was going because she was to present a paper by the Pennsylvania School. The convention was to last a full week, but the deceased was required to be back at her work on Thursday, so she arranged to return with a friend who had no connection with the Bureau. It was decided to pay the deceased her full salary for the month of June, without deduction for the time of her absence, and this time was not to be subtracted from her vacation period. On June 16, she was paid her salary for the month, the testimony being that this was occasionally done when a worker wanted her money in advance. It was testified that the deceased's attendance at the convention would not have been thought of originally had it not been for her known plan to attend for the purpose of presenting the paper, and that this had "stimulated the whole question of her going;" furthermore, that it was felt that attendance at such conventions was a part of the training for social work, and that the deceased, by reason of her experience, would bring back something of value to the Bureau as a result of her attendance. The question was asked

by a member of the Board whether the deceased had been ordered to go to the convention, and the answer was that the Bureau "did not make that kind of arrangement, people ask if they can go, and if they say they can, they go."

The party left Wilmington for Buffalo on June 18, and arrived there safely. Presumably, the deceased presented her paper at the convention, although there is no evidence that she did so. The deceased, in the automobile of her friend, left Buffalo on the evening of June 21. The accident and resulting death occurred the next morning in the State of Pennsylvania.

On behalf of the claimant the following decisions were cited: *Williams v. School City of Winchester,* 104 Ind. App. 83, 10 N. E. 2d 314; *Stockley v. School District No. 1 of Portage Township,* 231 Mich. 523, 204 N. W. 715; *City of Fremont v. Lea,* 115 Neb. 565, 213 N. W. 820; *Howell v. Kingston School District,* 106 Pa. Super. 89, 161 A. 559; *Miller v. Keystone Appliances, Inc.,* 133 Pa. Super. 354, 2 A. 2d 508; and *Mann v. Board of Education of City of Detroit,* 266 Mich. 271, 253 N. W. 294. In all of these cases the employee was killed while going to, at or returning from conventions, institutes, gatherings or on visits relating to the employment. In all of them, except the last, the employee had been ordered to make the journey, either directly or by necessary implication, and in each case this fact was regarded as of high importance.

In the Mann case, a principal of a High School in Detroit was killed while on his way to Ann Arbor, Michigan, in response to an invitation from the Registrar of the University of Michigan to visit Ann Arbor, and there to confer with freshmen at the University who had been graduated from the Principal's School. The scheme of having High School Principals visit the University, meet former students, and consider their records, originated with the University officers. Attendance was entirely voluntary. It was

held that such meetings were designed as a survey of practical results, and were of intended benefit to the school system; that attendance, while voluntary, arose out of the employment; and that the deceased was not exercising a personal privilege wholly apart from his employments or his employer's interest, but was about the performance of an act incident to and recognized as of value by his superior in connection with high school purposes. This is the only case cited which fairly supports the claimant's contention, but, we think, it may be distinguished from the instant case. Parents take a keen interest in the progress of their children at colleges and universities. Principals of High Schools are subjected to criticism if the records of their former students are not satisfactory. To refuse the opportunity to discuss the problems of those students and their records at the college or university at a meeting designed for that purpose would evidence an indifference bound to reflect adversely upon the professional standing of the principal. In this field, as in others, competition is sharp. While attendance at such meetings was voluntary, the effect of non-attendance, reasonably considered, was such as to make attendance compulsory.

There is an utter lack of harmony in the decisions, and it is quite generally agreed that there is little use in referring to them. Each case must be decided on its particular facts, and, in the instant case, with reference to the statute defining the term, "personal injury sustained by accident arising out of and in the course of the employment." The term does not "cover" an employee except while he is engaged in, on or about the employer's premises, or except "while he is engaged elsewhere in or about his employer's business where his services require his presence as a part of such service at the time of the injury." Rev. Code, § 6115, Sec. 45.

An injury may occur in the course of the em-

ployment without any essential causal relation between the employment and the injury. The requirements, "in the course of his employment," and "out of * * * the employment" must conjoin. The former relates to the time, place and circumstances of the accident; the latter to its origin and cause. 71 C. J. 642 *et seq.* The relation of the accident to the service is the essential point of inquiry. The question is whether the employer exposed the employee to risk. Service to the employer must, at least, be a concurrent cause of the injury. Where a private purpose and service to the employer coexist, the facts of the case must permit the inference that the journey would have been made even though the private purpose had been abandoned. The test is whether it is the employment or something else that impels the journey and exposes the traveler to its risks. If the service creates the necessity for the travel, the employee is in the course of his employment, even though, at the same time, he is serving some purpose of his own. On the other hand, if the service has not created the necessity for the journey, if it would not have been made at all except for the private purpose, and would have been cancelled upon its abandonment, the travel and the risk are personal. *Marks' Dependents v. Gray*, 251 N. Y. 90, 167 N. E. 181; *Barrager v. Industrial Commission*, 205 Wis. 550, 238 N. W. 368, 78 A. L. R. 679.

We do not overlook the testimony, that attendance at such conventions was considered as training in social work, and that it was expected that the deceased would be able to contribute something of value to the Bureau as a result of her attendance; but these considerations were plainly remote and collateral. The deceased employee was in no atmosphere of necessity or compulsion. She had not been directed, or even requested to go to the convention. There is no suggestion that she, a newly employed worker at a small salary, was expected to assume the expense of the journey as a part of her service; nor that her professional standing would have suffered in the least had she not gone.

Her desire to go to the convention, her purpose, and that she was a delegate representing the Pennsylvania School were known to the Bureau, without which her going would not have been thought of. The Bureau had arranged for its own representation by its older employees, whose expense, in part at least, it bore. The deceased was allowed to travel in the Bureau's car, but entirely at her own expense; and she was to remain at the convention for a limited period. The permission granted was an indulgence so that, at small expense, she could present her paper and thereby, perhaps, enhance her reputation in her chosen field. True, the purpose of her journey was not unrelated to the service; but it was the private purpose, not the service, that induced and compelled the journey. The travel was hers, and so the risk. The conclusion must be that the employee's death did not arise out of her employment.

The testimony in relation to the dependency of the claimant was before the Board by way of depositions of the father and brother of the deceased. Timely and proper objections were made to much of this testimony before the Commissioner, but invariably the objections were overruled. The objections were again vainly interposed at the reading of the depositions at the hearing before the Board. The result was a record replete with testimony and exhibits plainly inadmissible under any sound theory of dependency at the time of death. A consideration of the many erroneous rulings would unduly prolong this opinion, and statements of the obvious would serve no useful purpose. Moreover, in reaching our conclusion we take the testimony as we find it.

It appeared that the father, 52 years of age, had lived for some years on a rented farm near Sheridan, Oregon. He had suffered financially in the depression of 1932. He cultivated about 100 acres; and maintained a dairy herd of about 10 cows. By the terms of his renting he paid the landlord one-third of the value of the crops, and $100 for the pasture

land.   In 1938, his share of the crops in value was around $600.   It does not appear what his income from the dairy was.   He testified generally that he was just able to provide the bare necessities of life.

The deceased daughter was graduated from the University of Oregon in 1932, her college expenses having been paid by the father.   She engaged in social work in Oregon in that year, and was employed in that State at a salary of $100 a month until 1939.   Thereafter she was employed in the same work in Boise, Idaho, in Portland, Oregon, and in Yakima, Washington, at monthly salaries ranging from $125 to $165.   In the fall of 1938 she went to Philadelphia to study for a master's degree at the Pennsylvania School of Social Work; and from that time until her employment with the Bureau on June 1, 1939, she earned nothing, but lived on her savings.

Testimony was admitted with respect to joint accounts opened by the deceased in the name of the claimant and herself.   One of the accounts was in a Philadelphia Bank.   It was not shown when the account was opened, nor do the particulars of the account appear.   At the time of the employee's death, the amount of the account was about $500, and was eventually paid to the claimant.   In June, 1939, the deceased opened a similar account with a Wilmington Bank in the sum of $75.   She withdrew $70 on June 12; deposited $60 June 17; and the balance at death, $65, was paid to the claimant.   But it was clearly shown that neither of the accounts had ever been drawn on by the claimant herself, nor by the daughter for the claimant's benefit.   The objections offered to this testimony should have been sustained.   The bare existence of the accounts, without more, did not tend to prove the dependency of the claimant.   The establishment of the accounts, which at any time might have been entirely exhausted by the deceased herself, shows indeed a willingness to aid the claimant if the necessity arose; but as the

accounts never were used for the claimant's benefit, it must be supposed that she did not rely on them for support. In the circumstances shown, the only inference that can be safely drawn is that the accounts were arrangements looking to the future; to supply the place of a testamentary disposition, thereby saving the necessity of administration in the event of death.

From September, 1938, to the death of the employee, there was no satisfactory evidence that the deceased contributed anything to the claimant's support. There was no check or check stub evidencing the payment of money to the mother or to the family; and no correspondence from which the transmission of money could be inferred. In response to a question put to the father as to the period of time covered by the deceased's contributions to the claimant's support, he replied: "From the time she got out on her own until she went back East." He was then asked: "Did she send any cash from either Philadelphia or Delaware?" The answer was: "Well, no, she left that account, the joint account in her mother's name. She had it that she could draw on it any time." The brother was asked how frequently contributions were made by the deceased during the period from June 1938 to June 1939, either in cash or by check. He answered: "Well, of course, that was during the time she had these joint accounts, and my sister was in school at the time, and mother did not feel like she wished to take any more than she had to from them, because she felt that she did not want to while sister was going through school. I imagine she might have sent some cash, $5 or $10 say once a month or so."

The testimony of the brother was hearsay in so far as it represented the mother's mental attitude. It confirmed the fact, if confirmation be needed, that no part of the joint accounts was ever used for the support of the claimant; and it was entirely without probative force as showing contributions made by the deceased during the pe-

riod of time, having regard for the precise language used, and considered in connection with the testimony of the father and the absence of all evidence of the transmission of money.

Dependency is largely a question of fact to be determined from the circumstances of the particular case. The burden of proof rests on the claimant. It must appear that the employee made contributions to the claimant, and that they were, in fact, relied upon by the claimant as a means of living. *Benjamin F. Shaw Co. v. Palmatory*, 7 *Boyce* 197, 105 A. 417. The statute limits the issue to the time of the death of the employee. It speaks of the reasonable present. The question is not one of a past dependency, nor of a possible future dependency. The evidence indisputably was that for some nine months prior to June 22, 1939, the deceased had contributed nothing to the claimant's support. She was living on her savings. She had not finished her course of study at the Pennsylvania School. Her salary with the Bureau was only $100 a month for eleven months of the year, less than she had ever received in the West. What future contributions she might make for the claimant's support, were possibilities dependent on earnings, inclination, health, marriage, and the mother's own financial position. This is a forbidden field of conjecture. What the claimant's precise necessities were while the deceased was in the East, did not appear. The brother's testimony to this particular was vague. "My sister's death," he said, "would take the funds away. She really has not had the vacation, dresses and things she had before my sister died."

This Court acts with a prudent caution in reversing a finding of fact made by the Industrial Accident Board. It will not disturb the Board's findings if there was evidence from which its conclusions could have been fairly and reasonably drawn. *Rudnick v. White Bros.*, 7 *Boyce* 576, 109 A. 881; *Gooden v. Mitchell*, 2 *Terry* (41 *Del.*) 301, 21 A.

2d 197. The reason for the rule, generally observed by reviewing courts, is that the trial court sees and hears the witnesses, and is better able to determine the credit and weight to be given to their testimony. The reason falls when the testimony is not presented orally. *New York Trust Co. v. Riley,* Del. Sup., 16 A. 2d 772. But apart from this, where there is no satisfactory proof that, for a reasonable time prior to the injury or death, the claimant relied on the employee's earnings for support, the duty of the Court is clear. The passage of the Workmen's Compensation Act, Rev. Code 1935, § 6071 *et seq.,* makes a long forward step in social progress. Having regard for its purpose, the act should be construed and administered with a reasonable liberality. The act is not, however, based on eleemosynary principles, but upon the fundamentals of injury or death arising out of and in the course of employment, and reliance upon the employee's earnings for support. Indiscriminate awards of compensation, based on uncertain evidence, or on sympathy, are not in the public interest.

The conclusions must be that there was no evidence from which the Industrial Accident Board could reasonably have found that the deceased was killed in an accident arising out of and in the course of her employment, or that the claimant was dependent upon the deceased employee for support at the time of her death.

The decision of the Board is reversed and the award of compensation is annulled.