GEORGE HUNTER, Father of John Hunter, Deceased, Claimant-Appellant, v. WRIGHT TRANSFER & SUPPLY Co., Appellee.

(*November* 10, 1949.)

PEARSON, J., sitting.

*David B. Coxe, Jr.,* for the claimant-appellant.

*William Poole* (of the firm of Southerland, Berl and Potter) for the employer-apellee.

Superior Court for New Castle County, No. 113, Civil Action, 1949.

PEARSON, Judge.

The claimant's son was an employee of Wright Transfer & Supply Co., the appellee. While driving his employer's truck on July 17, 1948, in the course of his employment, he sustained severe physical injuries. He was taken to a hospital in Wilmington where he was treated until his death on August 9, 1948. The Industrial Accident Board found from the testimony of certain doctors. including a surgeon and neurologist who treated him and a pathologist who performed an autopsy, that the cause of his death was unknown. The Board further found that "no evidence of the cause of death of John Hunter [the employee] was presented." The Board held that "The burden of proof as to the cause of death of John Hunter is upon the claimant and has not been substantiated by evidence"; and dismissed the petition for compensation. The claimant has assigned as error the Board's findings of fact and conclusions of law. The principal question is whether the claimant sustained the burden of proof which devolved upon him.

At the time of the accident, the employee was twenty-four years of age and had always enjoyed good health. The attending surgeon testified before the Board that "he must have been a

good healthy husky fellow before he was hurt." The surgeon also testified that the employee

"* * * was brought in the hospital on July 17th, 1948 with a history of having been in an automobile accident. When I first saw him he had a compound fracture of the left tibia, both bones of his left leg below the knee, tibia sticking out through the one. He had a crushed right leg above the knee practically off at the lower third. He also had a contusion of the left hand which didn't amount to anything. What I did was to amputate the right leg so as to get rid of all that injured part and do an open reduction on the fracture of the left leg. He was quite shocked on admission but he made an uneventful recovery and he did very well until about the 28th, I think it was of July when I went in to see him one day and they reported to me he was having difficulty in swallowing. I didn't think much of it but as soon as I saw him I could see he was very seriously ill. * * *

"* * * His condition gradually grew worse—this difficulty in swallowing and breathing until August 9th he died. I saw him that morning and I thought he was a little better but in the afternoon he died very suddenly. Up to that time his wounds had practically healed—he showed no signs of infection and in fact he was apparently perfectly recovered until this thing hit him. * * *

"* * * the shock cleared up in—I guess 24 hours. * * *

"* * * We naturally thought of an embolus or thrombosis —I also thought of poliomyelitis—it was a most peculiar thing and as I say he went on gradually and got worse until he died. An autopsy was held and the autopsy showed no cause as anything we could put down as the cause of death. In other words, those things we thought of, the embolus and thrombosis were not present. It is a most difficult thing—I don't know what he died of. As far as I can see from the facts we had in the case I feel he had some coincident condition develop which was the

cause of his death and apparently had no relationship to the accident. I say that, realizing that it is perfectly natural to think the accident might have caused his death, but if I would say that and be asked to say why, I couldn't say, because I have nothing to base that statement on. * * *

"My feeling is that the accident had nothing whatever to do with his death. * * *

"Q You said that in your opinion it didn't come from the accident? A. Because I can't find anything to justify me in making that statement from the findings in the case.

"Q. Nor could you make a statement it did come from the accident? A. I couldn't say it did for the same reason.

"Q. Isn't your answer that he doesn't know whether it did or did not come from the accident? A. If I say it came from the accident I can't see how I am justified in saying it because I haven't anything to make me prove it.

"Q. Do you have anything to say it didn't come from the accident? A. For the same reason—I found no embolus—we found no thrombosis—we found nothing to justify me to say it came from the accident. I realize when a man has an accident as bad as that that you are going to say if it didn't kill him, indirectly, what did. We haven't got anything to say it did—on the other hand I can't say it did."

The autopsy report contains the following notations of the Pathologist:

"Cause of Death (gross): Immediate cause undetermined.

Contributory—compound fracture of both lower legs; amputation of right lower leg.

"Cause of Death (Final): Undetermined.

Contributory: Remote fracture both lower legs; Remote am-

putation, right lower leg; Cerebral congestion and slight cerebral edema."

The pathologist was questioned concerning these statements of contributory cause, as follows:

"Q. Then the only reason you put it on as contributing was because there had been a severe accident and amputation? A. That is correct, that is considered pathological practise as it would be in any other stated condition. The fracture was a related feature of this patient's illness leading to his death, the cause of death is undetermined."

The claimant contends that the employee's injury and death fall within the scope of the following language of the Workmen's Compensation Law (Rev.Code of Del., 1935, § 6114, as amended in 41 Laws of Del. 716): "6114. Section 44. Terms construed: The term 'injury' and 'personal injury' as used in this Chapter shall be construed to mean violence to the physical structure of the body, such disease or infection as naturally results directly therefrom when reasonably treated and compensable occupational diseases, as are hereinafter defined; arising out of and in the course of the employment. When death is mentioned as a cause for compensation under this Chapter, it shall mean death resulting from such violence, its resultant effect when reasonably treated as aforesaid and occurring within two hundred and eighty-five weeks after the accident, and compensable occupational diseases, as are hereinafter defined, arising out of and in the course of the employment."

It is axiomatic that, in order to recover, the burden is on the claimant to establish his claim. The particular aspect of his claim which the Board held he did not establish, and which he contends he did, is the relation between the employee's admitted injury and his admitted death. That relation is desoribed in the statute as "resulting from" and as "its resultant effect when reasonably treated". Now, it is undisputed that prior to the accident, the employee was a young

man, in good health; that he received severe bodily injuries; that as part of his treatment, he underwent a serious operation; and that he died twenty-three days after the accident. The autopsy report and the testimony of the pathologist indicate that the "cause of death" was "undetermined"; but that the injury and amputation were a "contributory" cause and "a related feature of this patient's illness leading to his death". It is true that none of the doctors would say that the injury and amputation "caused" his death. However, none of them pointed out anything else which they considered the "cause" of death, rather than the injury and amputation. They found from the autopsy no corroborative physical evidence of what they had suspected as the "cause"; and found nothing that "could be put down as the cause of death." The surgeon testified that, in his opinion, death did not come from the accident; but qualified and limited this opinion by the explanation "Because I can't find anything to justify me in making that statement from the findings in the case." Of course, nowhere in his testimony did he express an opinion, or state any grounds for an opinion, that death would have been likely to occur when it did if the employee had not been injured at all. It seems apparent from the testimony of the doctors that their statements about cause of death mean that they were unable to construct a theory of the cause of death in accord with medical etiology which they deemed acceptable and relevant.

But even without such a theory, under the circumstances of this case,—the youth and good health of the decedent, the severity of his injuries, the short period intervening before his death, the absence of any other specific casual factor, known or suspected,—common knowledge and commonly accepted etiological notions compel an inference of "resultant effect", as used in the statute, between the death and the injury. Compare *Saylor v. Greenville Steel Car Co.,* 157 *Pa.Super.* 331, 43 *A.* 2d 633; *Glass v. Kieckhefer Container Co.,* 45 *A.2d* 852, 24 *N.J.Misc.* 37.

That inference stands unrebutted by any of the medical testimony. The statute cannot reasonably be held to require further proof of the "resultant effect" relationship under such circumstances as are present here. Thus, the definitely established facts and the unrebutted inference from them constitute sufficient evidence of the "cause of death" to establish the claimant's burden of proof.

█ The findings of the Board must be followed by this Court if it appears from the record that there was evidence to support them. *Le Tourneau v. Consolidated Fisheries Co.*, 4 *Terry* 540, 51 *A.2d* 862; *Philadelphia Dairy Products v. Farren*, 5 *Terry* 380, 57 *A. 2d* 88. But from what has been said, it is plain that the learned Board, in finding that the cause of death was unknown and that no evidence of the cause of death had been presented, failed to recognize the limited and qualified scope of the testimony of the doctors and failed to recognize that the established facts themselves give rise to an inference of the relationship of "resultant effect." The evidence, in my view, does not justify the findings. On the contrary, I conclude that the evidence warranted only a finding that the required relationship existed. The decision of the Board should be reversed and the cause remanded with directions to award compensation to the claimant.

An order accordingly will be entered.