A. H. ANGERSTEIN, INC., Employer-Appellant, v. STANLEY JANKOWSKI, Claimant-Appellee.

(*December* 21, 1962.)

LYNCH, J., sitting.

*Clement C. Wood* (of Allmond and Wood) for Employer-Appellant.

*Thomas Herlihy, Jr.,* and *Thomas Herlihy, III,* for Claimant-Appellee.

Superior Court for New Castle County, No. 382, Civil Action, 1961.

LYNCH, J.:

I shall refer to the parties to this appeal as Employer and Claimant. Since I am constrained to reverse the award I feel compelled in my review of the record and the many briefs submitted by counsel to refer to the testimony in some detail and consider and dispose of all the arguments advanced,—thus necessarily extending this opinion to a length greater than I would ordinarily.

Sometime after 7:00 A.M. on September 30, 1959, Claimant was found on the ground of his Employer's premises, with a portion of his body under a truck; his legs were under the truck, substantially up to his thighs. Supposedly he had been engaged in welding the muffler of the truck with an electrical welding outfit furnished by the Employer. The cords to this electric welding outfit were found later on the ground some six feet away from Claimant's hands and some eight to ten inches from his feet; the ends of the welding cords appeared to have been placed on the ground; it did not appear they had been thrown down suddenly or haphazardly, as would be the case if something unusual had appened. Claimant was *not* wearing a *welders' shield or gloves,* and there were *no burns on his body.* The electrical welding machine was checked and found to be in proper working order and without any shorts or grounds. There were no eyewitnesses to what had transpired. It was not shown that the electrical cords had been connected or any switches were "on".

Unfortunately because of what happened on that day—whatever it may have been—Claimant has been unable to orally convey[1] the story or facts regarding what had happened to him before he was found in the helpless condition referred to.

Claimant's attorney sought to prove the necessary facts showing he is entitled to an award under the Workmen's Compensation Law through (1) Claimant's attempts to make himself understood; (2) by a hospital record and (3) by circumstantial evidence surrounding his being found. Claimant's factual thesis is that Claimant sustained an electrical shock

---

[1]This is well illustrated by what happened in the course of cross examination of witness Banning who found Claimant after he had become disabled.

"Q   Mr. Banning, you saw Mr. Jankowski on the day of the accident, and as you have already testified, he wasn't able to speak; isn't that correct?

"MR. HERLIHY: I don't think he has testified to that.
"BY MR. WOOD:

"Q   All right, what was he able to say at that time?

"A   He was able to say one word. It would mean one word to us but it meant something else to him, I have an idea.

"Q   What was the one word?

"A   'No.'

"Q   Was he able to say anything else?

"A   No.

"Q   When next did you see him?

"A   Three or four days later.

"Q   Was he able to say anything at that time?

"A   Same word.

"Q   'No'?

"A   Yes.

"Q   And when did you see him the next time?

"A   A day or two later.

"Q   And what was he able to say at that time?

"A   'No.'

"Q   In other words, was it 'No' to anything that you said to him?

"A   He carried on a complete conversation using the one word.

"Q   In other words, the only word that he could express was 'No'?

"A   Was 'No.' "

which ultimated in the physical condition—the stroke or paralysis—in which Claimant was found and that this "shock" caused the paralysis from which Claimant is now suffering.

Claimant's attorney apparently convinced the Industrial Accident Board Claimant's present physical condition resulted from a "shock". An award was made, the Board finding that "he suffered electrical shock when welding under a truck" and Employer has appealed from the award. The only evidence tending to support such contention and the award is found in the history of the accident appearing in hospital records, which contain several references to "electrical shock". No one knows who furnished the information as to the electrical shock in relation to Claimant's physical condition. There were no burns and, as noted above, no one can say the electrical welding outfit was "on" or had been in use by Claimant. The testimony of the doctors who attended Claimant while he was hospitalized is all one way,—*viz.*: that Claimant suffered a stroke which brought about his present physical disability. It is referred to as a thrombosis in the left carotid artery, causing the stroke and resulting paralysis. All this will be considered later.

A careful review of the transcript of testimony adduced before the Industrial Accident Board shows clearly that Claimant was furnished an electric welding outfit by Employer, to be used to weld a loose muffler on his truck so as to stop it from rattling. No one saw Claimant thereafter for some considerable period of time. Later he was found conscious in the position stated above by Mr. Banning. When asked by Mr. Banning if he was hurt Claimant then responded "No". No evidence was adduced tending to show that the electrical welding outfit was turned "on" or had been in use that morning prior to Claimant's being found near his truck. As heretofore stated the welding outfit was found to be in proper working order.

Claimant, as stated, is still incapable of intelligible speech, hence he cannot say what happened on the day in question. Claimant's testimony regarding the circumstances of being injured appears on page 5 to 15 of the transcript; and to state matters in the kindest manner possible it is impossible to comprehend his testimony or understand what he sought to convey. This is even borne out by Mr. Herlihy's comments to the Board (Page 15 of the Record):

"MR. HERLIHY: I think there may be some orientation which will enable him to adjust himself, but I can't go any further at the present time with him. I am certain now that the Board is aware of any situation indicated in my opening statement. I don't want to make any more elaborate statement because it may have just confused him or upset him."

In his Opening Statement to the Board, Mr. Herlihy, among other things, said:

"* * *. The claimant in this particular case presents a problem in that it may be difficult for him to testify clearly because of the nature of the injury. * * *."

At a later point in his Opening Statement Mr. Herlihy asked the indulgence of the Board in his questioning of the Claimant, and he was permitted certain latitude in the use of leading questions. Ultimately, however, it became evident that the Claimant could not give intelligent answers to the questions and Mr. Herlihy's remarks, appearing above, were then made for the record. An examination of the record shows no other efforts to have Claimant testify and study of his testimony leads to the conclusion that Claimant could not testify intelligently and—what is of great importance—respond sensibly to the questions propounded on cross examination.

Mr. Herlihy has argued:

"* * *. The claimant has relied upon Jankowski's testimony and physical demonstrations of a welding position and

his testimony that he sensed a 'bu-bu-bu-bu-bu' to show that he received an electric shock while welding for his employer. The claimant supported the competence and the credibility of Jankowski's testimony by the testimony[2] of Dr. Heather that the claimant could understand the statements of others *and could express himself*—although to a limited extent."

Then he contends:

"* * *. Including the above evidence with other evidence set forth in the claimant's brief * * *, it is submitted that the claimant established that he suffered an electric shock while welding for his employer. Briefly, the other facts were:

"(1) Jankowski was welding[3] for his employer (R-5, 6).

"(2) Jankowski appeared to be his usual self and in good health before he started welding (R-25, 145, 146).

"(3) When Jankowski was observed after the accident he was: (a) red in the face (R-25-A); (b) damp and sweaty (R-21); (c) indicating something was wrong with him (R-25); (d) indicating pain (R-28); and (e) only able to say the word 'no' for weeks (R-26).

"(4) Jankowski suffered aphasia and right hemiplegia[4] (R-38, 39).

"(5) Jankowski was using[5] an 'AC' welding machine, the most dangerous welding machine for shocks (R-163, 199).

"(6) The weather on the day of the accident, September 30, 1959, was damp and it had rained the night before (R-163).

---

[2]Claimant's attorney never qualified Dr. Heather as an "expert" on these lines and he overlooks claimant's inability to testify on cross examination—which is the underlying defect of Claimant's testimony.

[3]Which, I may observe, was never shown to have been operating.

[4]This was not shown to have been the result or consequence of an electric shock.

[5]See footnote 3, *supra.*

"(7) A welding expert, Mr. Pollock, testified that it was possible to receive a paralyzing electric shock from a welding machine[6] particularly under damp conditions, without a burning of the skin even though the machine is in good working order (R-188-192).

"(8) Dr. Heather testified[7] that electrical shock was a possible cause of the claimant's injuries (R-100)."

I think a litigant has the right to have the case asserted against him presented and proven on intelligible evidence,—particularly on cross examination. Through no fault of his own Claimant has not been able to relate to the Board or to counsel for Employer, in the course of cross examination, an intelligible story of what transpired on the morning of September 30, 1959, before he was found by Mr. Banning, a fellow employee. For that reason I hold that his testimony is not competent and could not have been used by the Board as any basis in making its award.

In effect and substance, Claimant's evidence is really no evidence. He said nothing from which one could find that he received an electric shock; and—of utmost importance— what he did say was not subject to cross examination by the attorney for the Employer. There is no other competent evidence in the record tending to prove Claimant received an electrical shock.

The record clearly shows by the statement of Claimant's counsel that even he was unable to get a clear story from Claimant, so I hold that Claimant's testimony never reached

---

[6]Claimant's evidence fails to show he was doing any welding; it appears to me that Mr. Herlihy has overlooked the testimony regarding, as well as the absence of testimony showing the lines were on, the whereabouts of the cords and the other gear used in welding.

[7]His testimony is not competent here because there was no proper foundation laid for an expression of any such opinion by Dr. Heather that Claimant had received an electrical shock.

the quality of evidence. It is not a question of whether or not this Court, as a reviewing Court, can disregard it, there is just nothing that qualifies Claimant's testimony as evidence. The reading of the record clearly demonstrates this.

Mr. Herlihy has made an observation on this matter of the right of cross examination which I find difficult to accept. He says that Mr. Wood "shows a lack of understanding of the unexplained death case argument", relied on by Mr. Herlihy, by citing and reliance on "the principles and authorities on the right and purpose of cross examination" arguing "these have absolutely no relevance in unexplained death cases".

He poses the question—

"Does Mr. Wood think that the employer had the opportunity to cross-examine the deceased employee in the unexplained death cases?"

Then he proceeds to argue—

"Under the unexplained death principle, when Jankowski's testimony is rejected, the question then becomes whether or not the employer successfully rebutted the presumption."

Mr. Herlihy has not, in my opinion, advanced his position one whit by this line of argument; he overlooks, as I show hereafter, that our statute does not provide any basis for utilizing and applying any "presumption" theory; it does not permit any shifting of burden, as he contends; or any justification for this Court to conjure up the theory and then apply it. The Board, this Court and the Supreme Court is bound by the statute. See page 313 *post*.

In his last Letter Memorandum (December 17, 1962) Mr. Herlihy refers to correspondence I had with Professor Larson involving the "unexplained death" cases—an argument advanced by Mr. Herlihy—and he quoted a paragraph from a letter sent by Professor Larson to me, *i.e.*:

"It seems to me that the inability of the claimant to testify is the heart of the matter in this case. *This circumstance equates the case exactly with the cases of unexplained death,* since the only reason for a special rule[8] in cases of unexplained deaths is the only person who could have explained the cause of the injury is incapable of testifying." (Emphasis supplied) Continuing in his Letter Memorandum of December 17, 1962, Mr. Herlihy further argued:

"* * *. Our letter of April 27th, 1962, presented our alternative contention in full on the principle of unexplained death cases. It can be briefly summarized as follows:

"(1) Since claimant is unable to explain his injury, this case is equivalent to an unexplained death case.

"(2) Since the injury took place within the time and space limits of employment, in the absence of conclusive evidence of what caused the death, the Court presumes that the injury arose out of the employment.

"(3) The burden being on the employer to rebut this presumption, the employer has failed to do so in this case. Claimant's medical expert presented just as plausible an explanation as that of the employer's expert, and the Board's reliance on one should not be disturbed.

"(4) Therefore, the employer failing to rebut the presumption to the satisfaction of the Board, the award should not be disturbed."

The short answer to Mr. Herlihy's arguments, says Mr. Wood, counsel for the Employer, is that the Employer has shown that the Claimant suffered a thrombosis of the left

---

[8]The whole difficulty with Professor Larson's view is, as I have heretofore stressed, that our statute does not permit the adoption and utilization of the "presumption", used by Professor Larson, which is the basis of the theory advanced. It cannot be reconciled with our decided cases, see p. 317, *post.*

internal carotid artery in the neck; then too Claimant's argument is based on a presumption theory which I have rejected.

I hold that the burden of proof did not shift to the Employer and as shown later the prior Delaware cases are in accord. If the law is to be changed on the matter of the suggested presumption or changing the burden of proof, it is for the General Assembly to make the changes.

Let's go back to the general ideas concerning the right of cross examination and see if it would be proper under the circumstances presented to give any credence to Claimant's testimony—which Mr. Herlihy says supports his thesis of a shock having been received.

When a witness has been examined in chief, the other party has the right to cross examine such witness for the purpose of ascertaining and exhibiting all aspects involving the witness with respect to the parties, to the subject of the litigation, his interest, his means of obtaining a correct and certain knowledge of the facts, his means of eliciting any other facts and his powers of discernment, memory and description. 58 *Am. Jur.* § 610, p. 339. The purpose of cross examination is to test the truthfulness of the witness and, if he is the plaintiff, to test his good faith—the righteousness of his case. (*Ibid*) In a judicial or administrative investigation, the right of cross examination is absolute and it is not a mere privilege. 58 *Am. Jur.* § 611, p. 340. Cross examination is one of the safeguards of accuracy and truthfulness of testimony. If one is deprived of the opportunity of cross examination, without fault upon his part, as in the case of the illness or death of a witness after direct examination, it is generally held that he is entitled to have the direct testimony stricken from the record. 58 *Am. Jur.* § 612, p. 340; *General Chemical Division v. Fasano*, 8 Terry 546, 548, 94 A. 2d 600, 601 (Super. Ct. 1953).

This doctrine rests in the common law rule that no evi-

dence should be admitted but what was or might be under examination of both parties and that *ex parte* statements are too uncertain and too unreliable to be considered in the investigation of controverted facts. (*Ibid*)

It was said in *Gausman v. R. T. Pearson Co.,* 284 Pa. 348, 131 A. 247 (1925), that the burden is always on a Claimant to establish that an electric shock was the proximate cause of his receiving some damage, otherwise there can be no recovery, and he does not meet the requisite burden of proof by testimony, which gives rise only to inferences that are a mere guess. As I show later by citation of cases, our Courts have always held that Claimants under our Act have to carry the burden of proof; in light of the language of the Act I see no way for me to adopt and apply a course otherwise than supported by the Act.

The position of a reviewing Court in this state on appeals in compensation cases is to determine whether or not there was substantial evidence presented to the Board to support the finding of the Industrial Accident Board; if so, such findings and the award must be affirmed. *General Motors Corp. v. Freeman,* 2 Storey 330, 164 A. 2d 686, 689 (1960). The proof, however, in order to support the award must be competent and satisfactory proof. If it is not, the duty of the Court is clear. *Children's Bureau v. Nissen,* 3 Terry 209, 221-222, 29 A. 2d 603, 609 (Super. Ct. 1942); an award cannot be based on incompetent testimony, *General Chemical Division v. Fasano, supra.*

I conclude, therefore, that Claimant's testimony, on its face, was entirely without probative force, and this being so, it cannot be given credence by a reviewing Court, and the reviewing Court, if it finds that the award was not based on competent evidence must reverse the award. *Children's Bureau v. Nissen, supra,* and *General Chemical Division v. Fasano, supra.* 100 *C. J. S.* Workmen's Compensation § 526. It

is stated therein that an award must be supported by competent evidence (*id.*) 100 *C. J. S.* Workmen's Compensation § 752e, p. 1133; 101 *C. J. S.* Workmen's Compensation § 812.

See also Volume 12, Schneider, *Perm. Ed. Workmen's Compensation*, Ch. 52, §§ 2526 and 2527.

That author having first stated that considerable latitude is permitted in the admission of evidence in proceedings under the Workmen's Compensation Acts, then proceeded to say:

"* * *. While the compensation acts contemplate great liberality in the admission of proofs and rules of evidence are not applied as vigorously in compensation proceedings as in litigation before a court of law, the practice of admitting incompetent testimony should be avoided. Courts are not authorized to disregard rules of evidence and rely on evidence clearly inadmissible.

"* * *. The commissions and boards must ascertain the substantial rights of parties from some competent evidence. In some states, however, it has been held that tests as to admissibility of evidence are the same as in common law actions. In other states the admission of evidence is held not governed by comon law or statutory rules. But the rule of liberal construction of the acts in favor of their humane purpose does not apply to the evidence." See *Children's Bureau v. Nissen, supra.*

It appears that Mr. Herlihy next relies on entries in a hospital record as a source of proof that Claimant received an electrical shock, which led to his present physical condition. This contention is strenuously challenged. I recognize that the Uniform Business Records Law, 10 *Del. C.* § 4310, supports the proposition that hospital records are admissible as an exception to the hearsay rule, but I do not believe that an unsupported statement, made by some unidentified person, found in such hospital records can be used to prove that a pa-

tient received an electrical shock. I seriously doubt that a party can use hospital records to prove a fact which happened outside of the hospital and/or was extraneous to the hospitalization, an operation or the care of the patient while in the hospital.

The statement in the hospital record is based upon a telephone call received by Dr. Philip Gordy (R-36). Dr. Gordy did not identify the caller and testified that he was sure the telephone call was not received from a person who had made an investigation (R-37).

When Dr. Gordy examined the Claimant on September 30, 1959, he made a provisional diagnosis of electrical shock. As he said (R-42), electrical shock was a presumptive cause at that time, it was not his diagnosis. Dr. Gordy's final diagnosis was "Thrombosis of the left internal carotid artery of the neck", and he testified under oath that the Claimant did not suffer an electric shock (R-53, 60). Hence, it is to be seen that the only other evidence of an electrical shock is pure hearsay, based on a statement of an unidentified person. The fact that this hearsay became a part of a hospital record cannot lend it any sanctity, since it is still hearsay and incompetent.

Assuming the admissibility of hospital records for certain purposes, see *Grossman v. Delaware Electric Power Co.*, 4 W. W. Harr. 521, 155 A. 806 (Super. Ct. 1929) and compare *Watts v. Delaware Coach Co.*, 5 Terry 283, 58 A. 2d 689 (Super. Ct. 1948); see also *Hoffman v. Palmer*, 318 U. S. 109, 63 S. Ct. 477, 87 L. Ed. 645 (U. S. Sup. Ct. 1943); *New York Life Ins. Co. v. Taylor*, 79 U. S. App. D. C. 66, 147 F. 2d 297, 303 (Ct. of App. D. C. 1945) and *Commonwealth v. Harris*, 351 Pa. 325, 41 A. 2d 688, 691 (Sup. Ct. Penna. 1945), they are not admissible for all purposes and under all circumstances, and never so, as far as I can determine, when the information appearing in the hospital record got into the records under the circumstances here shown.

Judge Layton, in *Watts v. Delaware Coach Co.*, *supra*, noted, 5 Terry at p. 296, 58 A. 2d at p. 694, the conditions under which entries in hospital records may be admitted. The opinion of the late Chancellor Harrington in *Grossman v. Delaware Electric Power Co.*, 4 W. W. Harr. at p. 524, 155 A. at p. 807 is likewise of interest and helps some.

It is to be further noted that Professor Wigmore, *Wigmore on Evidence*, 3d Ed. Vol. V, § 1521 and § 1530, stated the necessity of meeting certain safeguards to this rule involving the use of business records.

For instance in Section 1521, the author states:

"* * * this Exception sanctions the use of statements by persons whose testimony * * * is * * * the only testimony now available from that person. Hence the usual rule applies that the person must be unavailable as a witness."

I can't see how Claimant can overcome this defect because the identity of the person furnishing the information seems unknown and his inability to testify not shown, as required by the rule, is to be considered.

Later on in the same section the learned author notes:

"* * *. Where the absence of the desired witness is not somehow accounted for * * *, the entries cannot be used."

Then in Section 1530, Professor Wigmore points out:

"(1) There can be no doubt that the general principle of testimonial evidence should ordinarily apply here as elsewhere, namely, that the person whose statement is received as testimony should speak from personal observation or knowledge. This principle has often been invoked in excluding entries made by a person who had *no personal observation* of the supposed facts recorded." (Emphasis supplied.)

Dr. Gordy, who seems responsible for the entry, never testified that he observed Claimant receiving the shock, nor

could he name his informant. Just how Claimant could meet this requirement is highly problematical since the identity of the person furnishing the information to Dr. Gordy included in the report has never been established.

The foregoing principles are sufficient in my opinion as precedents and authorities for the exclusion of this hospital record, ostensibly made at the behest of some unidentified person.

Admission of the statement would result in a deprivation of the right of cross examination by Employer about which this opinion has been concerned elsewhere. There are no elements shown of any trustworthiness of the statement about Claimant getting the shock. Surely, if it was a fellow employee of Claimant who called in the information one could have confidently expected that person to come in and testify. This never happened and we are at loss to know who gave Dr. Gordy the information.

The absence of any trustworthy evidence tending to show Claimant was injured by an electrical shock is regrettable from his point of view, but the Employer should not be saddled with the liabilities of the statute in the absence of that kind of proof now required by the statute. I hold that Claimant cannot use the hospital records to prove he received an electrical shock.

One Kenneth Banning, a fellow employee of Claimant, the man who found Claimant on the morning in question, also testified; his testimony is to be found on page 16/35 and 69/74 of the record. It is not helpful in any way to Claimant. Aside from saying he had seen Claimant about 7:00 A.M. of the day in question, Mr. Banning added little—if anything— except to say he saw him about an hour and a half later, and as to this he testified:

"Q   And where was he at that time?

"A   He was half-way under and half-way out from underneath his truck, fumbling, and when I looked at him, I knew something was wrong with him so I went over and proceeded to help him.

"Q   Now was this truck on a lift or was it right on the ground level?

"A   It was on the garage floor."

Mr. Banning said in the course of his testimony:

"A   Well, the thing that attracted my attention was that there was something wrong with him. As I say, he was scrambling around and trying to get up. He apparently was trying to get up and wasn't able, trying to move and wasn't able. Well, I am not a doctor; I couldn't give you his physical condition, but I knew that there was something wrong with him. I just tried to help him.

"Q   Did he appear to be in pain?

"A   Yes, appeared to be."

Mr. Banning testified on cross examination:

"Q   Now when you came upon him first, was he holding the cord?

"A   No.

"Q   Was he holding the torch?

"A   No.

"Q   Was he wearing his gloves?

"A   I don't remember any gloves.

"Q   You don't remember any gloves?

"A   [no answer shown]

"Q   Anywhere about the scene?

"A  No, I don't.

"Q  Where was the shield, over his face or off his face?

"A  Off his face.

"Q  Off his face?

"A  Yes.

"* * *.

"Q  Now you said his skin was red. Where was the skin red?

"A  Facial.

"Q  Facial?

"A  Yes.

"Q  Did you observe his hands at all?

"A  No, I didn't.

"Q  Did you see any marks on his hands, burns or anything of the sort like that?

"A  No, I didn't."

When asked on cross examination if the welding machine was in operation, Banning testified:

"Q  Did you know the machine was running; could you hear it running?

"A  No, but that was my first thought before I touched him or anything else.

"Q  So you don't know whether the machine was running or not?

"A  No, I don't.

"* * *.

"Q How close was the torch and the ground wire to the muffler?

"A Well, they were both disconnected, laying together on the ground under the muffler."

The witness Banning made it clear, as I read the record, that both wires were underneath the truck's muffler, eight or ten inches from the Claimant's feet and five to six feet from the Claimant's hands (R- 29-30), and that the position of the wires would indicate that they were not dropped in a hurry (R 34). From the testimony alone it would appear impossible for the Claimant to have received an electric shock.

Claimant called a so-called "expert" on welding but the testimony he gave added nothing to what is set out above.

The foregoing constituted the full extent of the "direct" testimony or, for that matter, all of the testimony of all "the circumstances" surrounding the manner in which Claimant sustained, if he did, his alleged physical disability. Claimant's right to recovery on the basis of circumstantial evidence is argued. His attorney cites many cases which seemingly hold that circumstantial evidence may be sufficient to support an award and that the circumstantial evidence need not reach that degree of certainty which would exclude every other reasonable or possible hypothesis other than a determination which would show liability. The Employer, on the other hand, argues that the circumstantial evidence must exclude every reasonable or possible hypothesis, save that of showing some kind of an accident occurred in the course of employment and with the consequent disability. He cites and relies primarily on *Wilson v. Derrickson*, Storey, 175 A. 2d 400 (Sup. Ct.) (Nov. 1961) which involved a case of negligence. In the cited case our Supreme Court ruled, 175 A. 2d at p. 402:

"It is, of course, true that a plaintiff may establish the negligence of the defendant by proof of circumstances from

which an inference of negligence follows as a natural or very probable conclusion from the facts proven. Such a conclusion, however, must be the only reasonable inference possible from the admitted circumstances. If the proven circumstances are so consistent with the absence of negligence as with the existence of negligence, neither conclusion can be said to have been established and, accordingly, it would follow that a *prima facie* case of negligence has not been established for submission to the decision of the jury. * * *"

This is a very broad statement and seems applicable to the occurrence of accidents in workmen's compensation cases equally with accidents arising from negligence.

Claimant's attorney, on the other hand, points to the discussion of the burden of an injured employee in a compensation case as discussed by the Delaware Supreme Court in its decision in *General Motors Corporation v. Freeman*, 2 Storey 330, 157 A. 2d 889; *Id.*, 7 Storey 330, 164 A. 2d 686 (1960). In the *Freeman* case, the claimant became blind in one eye; the real problem was sufficiency of medical evidence to support that award.

There was medical testimony that it was possible that the blindness came from a traumatic occurrence while the claimant was at work. There was also medical testimony that it was possible that the blindness resulted from an eye disease which existed in the claimant's eye prior to the trauma. Admittedly in the cited case claimant's directly proven circumstances did not exclude every reasonable inference but that the eye injury was caused by a traumatic occurrence arising out of his employment. The Delaware Supreme Court however, in sustaining the award, discussed the claimant's burden in a workmen's compensation case, 164 A. 2d at 688:

"If the testimony of these [medical] experts should show that the injury was possibly the result of the trauma and such testimony is supplemented by other credible evidence tending

to show *that the injury occurred directly after the trauma* and without interruption, we think that such evidence would be sufficient to sustain an award." (Emphasis supplied)

In our case Claimant has never adduced testimony tending to show he was injured and Freeman therefore is hardly dispositive and it is very questionable if it is controlling of the question under consideration in the case at bar.

In § 2527 of Schneider, *Workmen's Compensation, supra,* the author states:

"The claimant has the burden of proving * * * by a preponderance of the evidence, all of the facts essential to a recovery. * * *."

It is to be observed that the author cites *Hunter* v. *Wright Transfer & Supply Co.,* 6 Terry 65, 69 A. 2d 296 (Super. Ct. 1949) and *General Chemical Corp. V. Fasano, supra,* as Delaware cases illustrating and applying the cited rule. See page 86, *supra.*

The Employer contends that the conclusion that the injury resulted from accident must be the only *reasonable inference possible from the admitted (proven) circumstances.* Ordinarily an injury, to be accidental within the meaning of the statute, must be traceable to a definite time, place and *cause. Steel Sales Corp. v. Industrial Commission* (1920) 293 Ill. 435, 127 N. E. 698, 14 A. L. R. 274; *Johnson Oil Refining Co. v. Guthrie* (1933) 167 Okl. 83, 27 P. 2d 814, 90 A. L. R. 616; *Tintic Milling Co. v. Industrial Commission* (1922) 60 Utah 14, 206 P. 278, 23 A. L. R. 325. In the case at bar, argues the Employer, the cause of the Claimant's condition could be only one of two things under the testimony— a stroke or an electric shock. If the condition resulted from stroke (natural causes), as seems to be the case, the Claimant may not recover.

The Employer notes that in the *Gausman* case, 284 Pa. 348, 131 A. 247, the Pennsylvania Supreme Court spoke as follows, 131 A. at page 248:

"Where an injury may be the result of one of two or more causes, for only one of which defendant is liable, the burden is on plaintiff to individuate that one as the proximate cause of his damage (citing cases), otherwise there can be no recovery * * *."

The Employer quite properly notes and argues that disability overtaking an employee at his work is not compensable unless the result of accident, and the burden is on Claimant to prove it was such and not from natural causes. The Employer strenuously contends in the case at bar there is simply no proof of an accident,—pointing out that not one doctor or one lay witness testified that it was his opinion that the cause of Claimant's condition came from electric shock.

Employer points out that all three of the doctors who testified in this case testified that the Claimant suffers from a stroke. Employer calls attention to Claimant's reliance on two statements made by Dr. Heather, one appearing at page 92 of the record, reading as follows:

"A   I would say that an electrical shock, if it happened as I understand it did, by causing the man to be unconscious —this is a round-about way to answer the question but it is the best way I can—if it would cause the man to be unconscious, during the period that his blood pressure was down there could be an occlusion occur at that time."

The other statement appears at page 100 and it reads as follows:

"Question: Doctor, for the purposes of this record, assuming that there was an electrical shock, are you in a posi-

tion to state that that was a competent and producing cause of his condition on September 30, 1959, or on the date when you examined him?

* * * * * *

"THE WITNESS: From my understanding, in talking to the man after he came in the hospital, the way he received the shock, I would think it would be possible to cause his arterial occlusion, yes."

The Employer, however, stresses that on his cross examination (R 109) Dr. Heather testified:

"Q Doctor, I ask you once again, had you had no history here of electric shock, to what would you attribute this man's condition?

"A Thrombosis.

"Q Thrombosis?

"A Yes."

Employer argues quite sincerely and with great force—and with justification—that Dr. Heather's testimony is based on nothing but hearsay. His diagnosis (he first saw the Claimant on October 20, 1959—the injury occurred on September 30, 1959, almost a month before) was hemiplegia with aphasia and he defined hemiplegia as a stroke. (R 77)

Under these circumstances the Court can give no effect to Dr. Heather's testimony when he said that Claimant suffered an electrical shock, and so such testimony will be disregarded.

It must be noted that Claimant had a history of carcinoma of the left tonsil with metastasis to the adjacent lymph node. He had been treated with X-ray treatments in the past for these physical conditions. After being found in his unforunate plight and taken to the Wilmington General

Hospital a metallic foreign body was found imbedded in the left side of his neck in the region of the carotid artery. Upon admission to the hospital Claimant was found to be suffering from aphasia and rightsided paralysis. Physical examination showed the pulse to be 80 and regular, blood pressure 150/98, heart sounds of good quality with no murmur or thrill, skin dry and warm. His condition was subsequently diagnosed as left hemiplegia with aphasia—a stroke. An arteriogram x-ray showed the presence of thrombosis of the internal carotid artery (R 60, 77). X-rays of the skull showed definite clouding of the ethmoid sinuses indicating disease of these sinuses (R 224).

In light of this past medical history and in the absence of some competent proof from which a reasonable inference can be drawn that Claimant suffered an electrical shock which played some part in causing the stroke, it is entirely logical to conclude that Claimant's present plight arises from some natural medical cause, such as a stroke, and cannot be traceable to any electrical shock.

Claimant's answering argument is, naturally, that *Wilson v. Derrickson* is not an Industrial Board case; it involved negligence, which need not be shown in a case of this type, and if there is any evidence which tends to support the award, the reviewing court must uphold the award. No one can challenge this last contention but on final analysis it only begs the question if the award is not supported by competent evidence.

Concluding his reply argument, based on the *Wilson* case, the Employer observes—quite properly—that the fundamental question is whether or not, from the facts established in the Claimant's case, the only reasonable inference to be drawn is that the Claimant's injury is due to an electric shock arising out of and in the course of his employment; and Employer contends that no inference can be drawn from the admitted circumstances, reasonable or otherwise, that

Claimant's injury is due to electric shock, hence, say the Employer, Claimant has not traced his injury to a definite cause, and the injury, under the Act, is therefore not accidental.

Under the statute Claimant must show his physical condition is a consequence of what happened to him while at work, arising out of and in the course of his employment.

I conclude the *Wilson* case, the absence of evidence tending to show the welding outfit was "on' or had been in use prior to or at the time Claimant was found by his truck, and his prior medical history, are relevant and binding and lead me to conclude that there is not sufficient evidence in this case to sustain the award.

Larson, *Workmen's Compensation Law*, Vol. 2, §§ 79.80 and 80.10 on page 317 says:

"* * *. A finding of fact based on no evidence is an error of law. Accordingly, in compensation law, as in all administrative law, an award may be reversed if not supported by any evidence. * * *."

It is not a case here of weighing the evidence to determine if there is "substantial evidence"; the Court has been unable to find any evidence in the record tending in the slightest degree to show Claimant suffered an "electrical shock" and, therefore, the award is without any support in fact, and I am, therefore, constrained to reverse the award. An order may be presented effectuating my determination.